**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
286 Madison Avenue, 11th Floor
New York, NY 10017
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Lauren C. Kiss
Kevin B. Collins

*Counsel to Plaintiff Fred Stevens, Plan Administrator*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>PRIME CAPITAL VENTURES, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-11029 (PGR) |
| FRED STEVENS, as Plan Administrator,<br><br>Plaintiff,<br><br>-against-<br><br>BERONE CAPITAL, LLC, BERONE CAPITAL FUND, LP, JEREMIAH BEGUESSE, FABIAN STONE, REIGN FINANCIAL INTERNATIONAL, INC., GIORGIO JOHNSON, GARY MILLS, MARTIN KARO, JUAN CARLOS A. MARQUEZ, QUATTRO CAPITAL LLC, FRAN KARO, and JOHN OR JANE DOES 1 TO 10,<br><br>Defendants. | Adv. Pro. No. 26-________ |

**COMPLAINT SEEKING (I) THE AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(a), 548(a)(1)(A) AND (B), AND N.Y. DCL §§ 273, 274, 276 AND 276-a, (II) THE RECOVERY OF AVOIDABLE TRANSFERS FROM ALL INITIAL, IMMEDIATE OR MEDIATE TRANSFEREES, OR BENEFICIARIES OF SUCH TRANSFERS, PURSUANT TO 11 U.S.C. § 550(a); (III) DAMAGES FOR BREACHES OF THE FIDUCIARY DUTIES OF CARE AND LOYALTY AND AIDING AND ABETTING BREACHES OF THE FIDUCIARY DUTIES OF CARE AND LOYALTY; (IV)**

**TREBLE ACTUAL DAMAGES IN CONNECTION WITH VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT UNDER 18 U.S.C. § 1962(c) AND FOR OPERATION OF AND PARTICIPATION IN A FRAUDULENT CONSPIRACY IN VIOLATION OF 18 U.S.C. § 1962(d); (V) RELATED RELIEF; AND (VI) PAYMENT OF PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT…………………………………………………………………... …1

JURISDICTION AND VENUE .......................................................................................... 4

BASIS FOR RELIEF ......................................................................................................... 4

PARTIES ........................................................................................................................... 4

FACTS COMMON TO ALL CAUSES OF ACTION .......................................................... 7

A. The Players.................................................................................................................. 7

B. The Ponzi Scheme...................................................................................................... 10

(i) The Fraud Concept.................................................................................................... 10

(ii) The Origin of the Fraud ........................................................................................... 14

(iii) The Proliferation of the Fraud................................................................................. 17

(iv) The Collapse ........................................................................................................... 18

C. The Bankruptcy Cases and Federal Equity Receivership .............................................. 20

D. The Ponzi Finding........................................................................................................ 25

E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture . 25

(i) Roglieri – Criminal and Civil Forfeiture Cases ........................................................... 25

(ii) Humphrey – Criminal Case ....................................................................................... 28

(iii) Snyder – Criminal Case ........................................................................................... 28

F. The Berone/Reign Fraud............................................................................................... 29

(i) Hooking Roglieri – The Enterprise Defendants Got Prime Capital’s $20 Million....... 29

(ii) Unbeknownst to Roglieri, the Enterprise Defendants Took Prime Capital’s Money .. 31

(iii) Prime Capital Realized Something was Wrong and Demanded its Money Back .... 35

(iv) Prime Capital Sued the Reign Parties (but not the Berone Parties).......................... 36

(v) Berone Got Prime Capital to Commit to Open an Account at RBC Capital Which Prime Capital Used in its own Fraud ........................................................................... 37

(vi) Prime Capital Finally Figured Out That the Berone Defendants Were in on it........ 40

(vii) Berone Named as Defendants in the Receivership Action ...................................... 41

(viii) The Enterprise Defendants Actively Frustrated the Bankruptcy Estate's Efforts to Figure out Where the Money Went........................................................................... 44

(ix) The SEC Sued Berone, Reign, and Their Respective Principals............................. 44

FIRST CAUSE OF ACTION (Actual Fraudulent Transfers)...................................................... 45

SECOND CAUSE OF ACTION (Constructive Fraudulent Transfers)....................................... 49

THIRD CAUSE OF ACTION (Attorneys Fees in Avoiding Transfers)..................................... 50

FOURTH CAUSE OF ACTION (Recovery of Fraudulent Transfers) ....................................... 51

FIFTH CAUSE OF ACTION (Unjust Enrichment) .................................................................... 52

SIXTH CAUSE OF ACTION (Breach of Fiduciary Duties) ..................................................... 53

SEVENTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duties)............... 55

EIGHTH CAUSE OF ACTION (RICO – 18 U.S.C. § 1962(c))................................................. 58

NINTH CAUSE OF ACTION (RICO Conspiracy – 18 U.S.C. § 1962(d))................................ 66

TENTH CAUSE OF ACTION (Pre-Judgment Interest and Attorneys Fees) ............................. 67

ELEVENTH CAUSE OF ACTION (Disallowance of All Claims)…………………………..…68

Fred Stevens (the "Plan Administrator" or "Plaintiff"), in his capacity as the Plan Administrator for Prime Capital Ventures, LLC, the above-captioned debtor ("Prime Capital" or the "Debtor"), by and through his counsel, Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against Berone Capital, LLC ("Berone Capital"), Berone Capital Fund, LP ("Berone Fund," and with Berone Capital, "Berone"), Jeremiah Beguesse ("Beguesse"), Fabian Stone ("Stone," and together with Berone and Beguesse, the "Berone Defendants"), Reign Financial International, Inc. ("Reign"), Giorgio Johnson ("Johnson"), Gary Mills ("Mills"), Martin Karo ("Karo"), Juan Carlos A. Marquez ("Marquez," and together with Reign, Johnson, Mills, and Karo, the "Reign Defendants"), Quattro Capital LLC ("Quattro Capital"), Fran Karo, and John and Jane Does 1 to 10 who are as of yet unidentified (collectively, the "Defendants," each a "Defendant"), seeking, among other things, (I) the avoidance and recovery of fraudulent transfers pursuant to 11 U.S.C. §§ 544(a), 548(a)(1)(A) and (B), and N.Y. Debtor and Creditor Law §§ 273, 274, 276, and 276-a, (II) the recovery of avoidable transfers from all initial, immediate, or mediate transferees, or beneficiaries of such transfers, pursuant to 11 U.S.C. § 550(a), (III) damages for breaches of the fiduciary duties of care and loyalty and for aiding and abetting breaches of the fiduciary duties of care and loyalty, (IV) treble actual damages for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") in connection with predicate wire fraud in violation of 18 U.S.C. § 1961(1), pursuant to 18 U.S.C. § 1962(c), and for operation of and participation in a conspiracy in violation of 18 U.S.C. § 1962(d); (V) related relief, and (VI) payment of all pre-judgment interest and attorneys' fees; alleges as follows:

## PRELIMINARY STATEMENT

Prime Capital was an advance-pay lending and Ponzi scheme created and operated by its principal, Kris Roglieri ("Roglieri"), and his co-conspirator, Kimberly Humphrey ("Humphrey").

Roglieri and Humphrey defrauded dozens of prospective borrowers out of well over $100 million based upon the false premise that Prime Capital had the present ability to fund large commercial loans to the victims. Prime Capital told the victims that the deposits were a precondition to Prime Capital funding the loans. In truth, Prime Capital had no ability to fund any loans as its only source of funds was the deposits obtained from new victims. Predictably, Prime Capital's fraud only lasted two short years from December 2021 to December 2023 before imploding under the weight of lawsuits brought by victims throughout the country seeking the return of their deposits and other damages.

Prime Capital took in at least $179 million in victim deposits and it used the proceeds of its fraud to: (i) purchase over $25 million in automobiles, jewelry, and other luxury items, for Roglieri and Humphrey; (ii) purchase a $4 million luxury property in Virginia Beach for Humphrey's use; (iii) prop up unrelated business ventures with over $10 million in cash transfers; (iv) make a $20 million highly speculative investment which itself turned out to be a fraud on Prime Capital; and (v) return deposits or make advances under the loans totaling approximately $109 million using the deposits from new victims in order to avoid the fraud from being discovered. Roglieri, Humphrey, and Humphrey's brother, Chris Snyder, have all been convicted of wire fraud charges and/or other crimes in connection with their operation of the Prime Capital Ponzi scheme.

Each and every transfer made by Prime Capital was in furtherance of its fraud and done with actual intent to hinder, delay, and defraud present and future creditor victims. Accordingly, the Plan Administrator is seeking the recovery of transfers made by Prime Capital including those to the Defendant(s) so that recoveries can be distributed to Prime Capital's creditor victims equally. In the instant case, Defendants actually defrauded Prime Capital out of $20 million on the pretense

that they would provide Prime Capital with capital to make its loans. The $20 million was transferred by Prime Capital to the Berone Fund for the purpose of gaining access to a trading platform offered by Reign (the "Transfer"). Those funds were expressly required to stay in the Berone Fund's account and were to be returned to Prime Capital if Reign was unable to gain entry to the trading platform. It was all a lie.

There was no "trading platform" or method or ability to access capital. The Berone Defendants and Reign Defendants worked in concert to defraud Prime Capital out of $20 million. As soon as it was transferred to the Berone Fund, the funds were moved through numerous other entities and accounts, including Karo's attorney escrow accounts, in order to intentionally layer and conceal the fraud. For nearly a year and a half, the Berone Defendants produced falsified bank statements to Prime Capital to make Prime Capital believe that its funds were still in the account where the initial Transfer was made although unable to be accessed. The Berone Defendants and Reign Defendants (collectively, the "Enterprise Defendants") actively conspired to and did in fact operate a fraudulent enterprise designed to defraud Prime Capital and keep Prime Capital from discovering the fraud. In doing so, the Enterprise Defendants committed numerous predicate acts set forth in 18 U.S.C. § 1961(1) including wire fraud, money laundering, and fraud in a bankruptcy proceeding. Accordingly, the Plan Administrator is entitled to not only avoid and recover the Transfer as a fraudulent transfer against the immediate, mediate, and subsequent transferees, together with interest and costs, but also to treble damages from the Enterprise Defendants under RICO. Each and every one of the Enterprise Defendants benefited from the Transfer and fraudulent enterprise and should be held jointly and severally liable for all damages owed to the Plan Administrator.

## JURISDICTION AND VENUE

1. This adversary proceeding relates to the chapter 11 bankruptcy case captioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR), pending in the United States Bankruptcy Court for the Northern District of New York before the Honorable Patrick G. Radel, United States Bankruptcy Judge (the "Bankruptcy Court").

2. The Bankruptcy Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157(a) and (b) and 1334(b), and Rule 81.1 of the Local Rules for the United States District Court for the Northern District of New York referring matters arising under Title 11 of the United States Code (the "Bankruptcy Code") to the Bankruptcy Court.

3. The Plan Administrator consents to the entry of final orders or judgments by the Bankruptcy Court with respect to all matters and claims raised by this Complaint.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## BASIS FOR RELIEF

5. This adversary proceeding is brought pursuant to sections 544(a), 548(a)(1)(A) and (B), 550(a)(1) of the Bankruptcy Code, sections 273, 274, 276 and 276-a of the New York Debtor and Creditor Law ("NY DCL"), treble actual damages for violations of RICO in connection with predicate wire fraud in violation of 18 U.S.C. § 1961(1), pursuant to 18 U.S.C. § 1962(c), and for operation of and participation in a conspiracy in violation of 18 U.S.C. § 1962(d), and the common law theories of unjust enrichment, conversion, breach of fiduciary duties, aiding and abetting breach of fiduciary duty, fraud, and fraudulent inducement or concealment.

## PARTIES

6. Pursuant to the terms of that certain *Trustee's Plan of Liquidation Pursuant to*

*Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 369-1][1] confirmed by Order of the Bankruptcy Court dated February 11, 2026 [Docket No. 401], the Plan Administrator and his predecessor were appointed and granted the standing, power, and authority to assert the claims in this Complaint. The Plan Administrator maintains offices at c/o Klestadt Winters Jureller Southard & Stevens, LLP, 286 Madison Avenue, 11th Floor, New York, New York 10017.

7. Prime Capital is a limited liability company organized under the laws of the state of Delaware. While it was operating, Prime Capital's principal place of business was 66 South Pearl Street, Albany, New York 12207. Prime Capital's bankruptcy estate is now under the control of the Plan Administrator and overseen by its Oversight Board comprised of Compass-Charlotte 1031, LLC, 526 Murfreesboro, LLC, Piper Capital Funding, LLC, and ER Tennessee LLC.

8. Roglieri is an individual who is currently residing at the Danbury Federal Correctional Facility, 33 ½ Pembroke Station, Route 37, Danbury, Connecticut 06811. Roglieri was the sole owner of Prime Capital's membership interests.

9. Humphrey is an individual who is, upon information and belief, currently residing at 506 Cavalier Drive, Virginia Beach, Virginia 23451. Humphrey is awaiting sentencing and potential incarceration. Humphrey was the Executive Vice President of Prime Capital.

10. Berone Capital, LLC is or was a limited liability company formed under the laws of the State of Delaware and is owned and/or operated by Defendants Jeremiah Beguesse and Fabian Stone. Berone Capital, LLC maintains or maintained offices at and/or has designated the following addresses for the service of process in its proof of claim filed in the Prime Capital bankruptcy case: 3595 Canton Road, Marietta, Georgia 30066. According to public records,

---

[1] Any citation to "Docket No." contained herein shall refer to the docket entries within the bankruptcy case fashioned *In re Prime Capital Ventures, LLC*, Case No. 24-11029 (PGR) before the United States Bankruptcy Court for the Northern District of New York.

Berone Capital voluntarily dissolved on November 29, 2023.

11. Berone Capital Fund, LP is or was a private and unregistered pooled investment vehicle formed as a Delaware limited partnership on or around July 12, 2021. Berone Capital, LLC is or was the General Partner of Berone Capital Fund, LP. Berone Capital Fund, LP maintains offices at and/or has designated the following addresses for the service of process in its proof of claim filed in the Prime Capital bankruptcy case: 3595 Canton Road, Marietta, Georgia 30066.

12. Jeremiah Beguesse is a resident of Miramar, Florida. Beguesse is an owner and is identified as the Manager and Chief Compliance Officer for Berone Capital, LLC. Beguesse maintains a residence at 2371 SW 83rd Avenue, Miramar, Florida 33025.

13. Fabian Stone is a resident of Cobb County, Georgia. Stone is an owner and is listed as a manager of Berone Capital, LLC. Stone maintains a residence at 530 Delphinium Way NW, Acworth, Georgia 30102, and/or 202 Bankside Point NW, Kennesaw, Georgia 30144.

14. Reign Financial International, Inc. is a corporation formed under the laws of the State of Delaware and is owned and/or operated by Defendants Giorgio Johnson and Gary Mills. Reign maintains offices and/or has designated the following addresses for the service of process at c/o Delaware Corporate Headquarters LLC, 8 The Green, Suite A, Dover, Delaware 19901.

15. Giorgio Johnson is a resident of Oregon City, Oregon. Johnson is the owner and Chief Executive Officer of Reign. Johnson maintains a residence at 14474 Livesay Road, Oregon City, Oregon 97045.

16. Gary Mills is a resident of Palm Beach County, Florida. Mills is or was the Chief Operating Officer of Reign. Mills maintains a residence at 9275 Legare Street, Boca Raton, Florida 33434.

17. Martin Karo is a resident of St. Johns County, Florida, and Bucks County,

Pennsylvania. Karo is a licensed attorney in the State of Pennsylvania. Karo maintains a residence at 661 County Road 13 South, Saint Augustine, Florida 32092, and/or 205 Garber Drive, Yardley, Pennsylvania 19067.

18. Juan Carlos A. Marquez is a resident of Fairfax County, Virginia. Marquez is or was the general counsel for Reign and is licensed to practice law in the District of Columbia. Marquez maintains a residence at 6402 Caleb Court, Alexandria, Virginia 22315.

19. Quattro Capital LLC is a limited liability company formed under the laws of the State of Wyoming. Quattro Capital maintains offices at and/or has designated the following addresses for the service of process: 633 Chestnut Street, Suite 900, Chattanooga, Tennessee 37450.

20. Fran Karo is a resident of St. Johns County, Florida, and Bucks County, Pennsylvania. Fran Karo maintains a residence at 661 County Road 13 South, Saint Augustine, Florida 32092, and/or 205 Garber Drive, Yardley, Pennsylvania 19067.

21. John or Jane Does 1 to 10 are currently unidentified defendants who may later be discovered to have received or benefitted from the Transfers from Prime Capital.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A. The Players

22. Roglieri is an Albany-area entrepreneur and commercial finance executive who was actively involved in the commercial lending and finance training sectors.

23. Prior to the formation of Prime Capital, Roglieri created, owned, and managed several other businesses.

24. On or around July 26, 2006, Prime Commercial Lending, LLC ("Prime Commercial") was formed by Roglieri as a New York limited liability company. Prime

Commercial was a small lender that made loans as small as $22,000 to businesses and up to $2 million on commercial real estate.

25. Other businesses created and operated by Roglieri include Commercial Capital Training Group ("CCTG"), a training organization for commercial finance brokers, and The Finance Marketing Group, a marketing company serving financial services businesses.

26. Roglieri also maintained certain entities associated with his collecting and showing exotic luxury sports cars including Shark Ventures LLC and FUPME, LLC.

27. Prior to his arrest in May 2024, Roglieri maintained a larger-than-life persona. Among other things, Roglieri wore flashy clothes, collected luxury wristwatches, smoked expensive cigars, and maintained a large fleet of luxury sportscars that he would show with the team name and Instagram handle "@teamloansharks" often emblazoned with the moniker "F—K YOU…PAY ME". Pictured here is Roglieri from his now removed Instagram page smoking a cigar while leaning against a sportscar after being pulled over by the police, in his garage amongst some of his cars, partying in Las Vegas with his girlfriend, on a private jet (actually posted from @postureupson with @teamloansharks tagged), and gambling at the Casino de Monte-Carlo, and partying with three friends on a yacht in the French Riviera from a video taken in October 2023 while Prime Capital was imploding:

















28. Roglieri was by all counts very successful in his prior ventures and already lived an opulent lifestyle long before starting Prime Capital in December 2021.

29. Humphrey is a lifelong resident of Virginia Beach, Virginia. Roglieri met Humphrey in or around the late 2010's when she allegedly purchased and took a commercial loan broker training course from Roglieri's CCTG along with her brother, Chris Snyder ("Snyder").

30. In 2020, CCTG published an hourlong podcast interview of Humphrey by Roglieri where the two talk at length about her history, their professional relationship, and the commercial

loan business:[2]




31. According to Humphrey's LinkedIn page, she sourced "the Debt and Equity for Deals $100MM+", and started as an Executive Vice President of Prime Commercial in or around November 2019.[3]

32. Upon information and belief based upon Humphrey's statements on the CCTG podcast, Snyder was partners with Humphrey in their lending enterprise, Capital Atlantic Solutions, which operated at or around the same time that Humphrey was also working for Prime Commercial.

**B. The Ponzi Scheme**

***(i) The Fraud Concept***

33. Prime Capital was formed on December 14, 2021, and purported to be a legitimate alternative (or nonbank) commercial lender. Prime Capital advertised proudly that:

---

[2] See Commercial Capital Training Group, LLC, Entrepreneurs in Finance | Episode 7 | Kimmy Humphrey [Video], August 24, 2022, https://www.youtube.com/watch?v=aL3qXCAYP-M&t=1437s (YouTube) at 11:36.
[3] See Kimberly H, *LinkedIn*, https://www.linkedin.com/in/kimberly-h-351800198/ (last visited July 22, 2026).




*See* Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:21.

34. Generally, alternative lenders offer borrowers some significant benefits over traditional bank lenders by having simpler application processes, fewer underwriting requirements, different and more flexible financing products, and more rapid funding.[4] Roglieri confirmed that this was Prime Capital's business model claiming that he "saw a rising demand from borrowers who needed to move projects forward with as little static as possible" and that Prime Capital could "provide solutions that are less restrictive than your average bank and offer generous terms that favor borrowers."[5] The disadvantage of going to an alternative lender is that they typically charge higher interest rates than what may be available at a traditional bank.[6] Prime Capital on the other hand offered all of the advantages of an alternative lender, while offering interest rates well below market.

35. On May 2, 2022, Prime Capital described its business in an article in DealMaker Magazine, a publication that Roglieri purportedly owned or started, as "a fund specifically

---

[4] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, kapitus.com, https://kapitus.com/blog/manage-your-money/financing/traditional-bank-vs-alternative-lender-which-is-better-for-your-small-business-kapitus/.

[5] Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release] https://www.prnewswire.com/news-releases/albany-new-yorks-prime-commercial-lending-funds-the-first-5-star-hotel-in-atlanta-ga-through-primes-real-estate-fund-prime-capital-ventures-301505069.html.

[6] See Calio, V., June 20, 2024, Traditional Bank vs. Alternative Lender, *supra*.

designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."[7] Prime Capital offered non-recourse loans with interest rates of 4 to 6% with interest only payments.[8] At the exact same time, interest rates were rising rapidly in response to inflationary pressure. At the time of Prime Capital's advertisement (May 2022), the prime interest rate was 4%, rising to 4.75% a month later, then to 6.25% by September 21, 2022, and peaking at 8.5% on July 26, 2023.[9] 15-year mortgages followed the same trend starting at 4.52% on May 5, 2022 and peaking at 7.03% on October 26, 2023.[10]

36. In order to be a successful lender, Prime Capital would have had the impossible task of obtaining capital at well below the 4 to 6% that it was offering to its prospective borrowers. In truth, Prime Capital had no known legitimate source of capital to lend to prospective borrowers. Instead, it obtained its capital by converting its prospective borrowers' own funds.

37. Prime Capital required as a condition of providing a loan that its prospective borrower provide 20% of the contemplated loan as an upfront deposit (defined as an "ICA Deposit," or collectively, the "ICA Deposits"). Roglieri stated that borrowers "have to come to the table with at least 20% and that's just an important function of how our product works."[11] Prime Capital claimed that it would hold the ICA Deposit "as prepaid interest throughout the term of the loan."[12] As interest payments became due, Prime Capital represented that it "would just

---

[7] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.
[8] See Id.
[9] See https://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm.
[10] See Freddie Mac https://www.freddiemac.com/pmms.
[11] See Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com.
[12] See Id.

deduct it from the [ICA DEPOSIT]".[13] Prime Capital admitted that this was "a unique way of doing things" but claimed that it "ensures [Prime Capital's] payback, and [the ICA Deposit] serves as additional collateral for the loan throughout the term."[14]

38. In an email dated April 27, 2023, Humphrey responded as follows to a prospective client's question about whether Prime Capital could transfer an ICA Deposit without a client's permission:

> When we pull through the hf [hedge fund], it [the ICA Deposit] gets locked by RBC [Royal Bank of Canada], Goldman [Sachs] or Interactive [Brokers] themselves. And it doesn't get unlocked until the line is completely paid back. In other words, if the ICA is $10m and the facility is $50m- RBC locks the 10m at the time they make the 50m facility available. It doesn't leave the account but we can't do anything with if bc [because] they collateralized it. Once we pay the 50m back they unlock the 10m.[15]

39. As Roglieri explained to a borrower client during a recorded Zoom call in December 2023:

> So with our process, we usually require anywhere from 20 to 30 percent down on, based on the total capital stack. . . We call that the essentially the ICA, it's an Interest Credit Account. We require that down payment in the form of cash to us because we view it as, it really performs three functions for us . . . number one, the ICA is considered essentially additional collateral for the loan throughout the term. Number two, it acts as pre-paid interest reserves, so theoretically our client never has to make a payment for us, payment to us on a quarterly or monthly basis when that money gets deposited in an account that we control in our name. The client . . . would get a statement every month or every quarter showing how much was drawn down and the interest that is due on that and that is essentially how we get paid back through that ICA account through the term. . . . There really isn't any risk. The [ICA] money gets put into a pledged account.[16]

40. All of Prime Capital's representations regarding the ICA Deposits and Prime Capital's ability to fund loans were false. ICA Deposits were not deposited into pledged accounts

---

[13] Id.
[14] Id.
[15] See USA v. Humphrey, Case No. 25-cr-00238, Docket No. 4, ¶5(d) (N.D.N.Y. June 10, 2025).
[16] See USA v. Roglieri, Case No. 24-cr-00392, Docket No. 90, ¶5(e) (N.D.N.Y. Nov. 13, 2025).

and Prime Capital had no ability to fund loans. In fact, Prime Capital's only source of capital was from obtaining ICA Deposits from victims, and many ICA Deposits were consumed immediately upon receipt by Prime Capital.

41. The ICA Deposits were an investment by the borrower victims to get access to Prime Capital's promise of cheap and readily available capital. A loan from Prime Capital would theoretically allow a prospective borrower to invest in its underlying business and hopefully make big returns. Prime Capital's prospective borrowers did not appear to have other viable sources of capital, or at least not any as inexpensive as what Prime Capital was offering. Prime Capital further enticed prospective borrowers with what appear to have been very little underwriting and collateral requirements. Prime Capital also did not require personal guarantees or recourse on the loans.

***(ii) The Origin of the Fraud***

42. In order to sell a business model that seemed entirely impossible if properly understood, and to get prospective borrowers to give Prime Capital new ICA Deposits, Prime Capital had to demonstrate that it actually made loans. It did this by, among other ways, fraudulently claiming to have made a "$188,000,000 funding of ALUX Properties, LLC and their project 'The Bailey' which will be the only 5-star hotel in Atlanta".[17]

---

[17] See Prime Commercial Lending, Prime Capital Ventures & The Bailey [Video], May 16, 2022, https://www.youtube.com/watch?v=A4_RKBepUkA (YouTube) at 0:13:




See also, Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release].

43. Prime Capital made a glitzy promotional video published on YouTube in May 2022 where it boasted about making this loan. The video featured Roglieri and others traipsing around the wooded area in Atlanta where "The Bailey" was going to be constructed. The alleged principal of ALUX Properties, LLC ("ALUX"), Brandon Wheeless, expressed his appreciation in the video stating that "access to this type of capital with trusted individuals that you close deals with definitely makes life a heck of a lot easier for us and the company so we are fast-tracking to grow at an exponential rate moving forward."[18] Depicted here are Messrs. Wheeless and Roglieri surveying the site, along with the "after" rendering of "The Bailey" contained in Prime Capital's video advertisement[19]:






44. In reality, Prime Capital never made any such loan to ALUX. There is no "The Bailey" hotel in Atlanta. According to Prime Capital's books and records, Brandon Wheeless, the purported principal of ALUX and third-party borrower of Prime Capital, was actually on Prime Capital's payroll and received a total of $200,000 from Prime Capital in $10,000 monthly payments between July 7, 2022 and September 18, 2023.

45. ALUX, the purported borrower, was placed into a receivership by the Georgia Superior Court on September 13, 2022 in connection with a lawsuit where the plaintiffs alleged,

---

[18] See Id. at 3:44 (transcribed by counsel).
[19] See Id. at 2:58 and 1:35, respectively.

among other things, to have been defrauded out of $10 million.[20] Featured in that litigation was an entity called Blackwater Capital Group, LLC ("Blackwater") which purported to act as a lender to the project, not unlike Prime Capital in its promotional video.[21] Blackwater's lending agreement was dated December 14, 2021, the exact date that Prime Capital was formed, and was nearly identical in form and substance to the form of lending agreement employed by Prime Capital.[22] Compared here are the first pages of the table of contents of Blackwater's December 14, 2021 lending agreement (on the left), and Prime Capital's April 24, 2023 lending agreement with creditor Compass-Charlotte (on the right)[23]:

Case 1:24-cv-00055-MAD-PJE Document 1-21 Filed 01/12/24 Page 92 of 302

DocuSign Envelope ID: 0CAFC338-732D-4304-B32B-FA350CA8AA9E

TABLE OF CONTENTS

| | Page |
|---|---|
| RECITALS | 1 |
| ARTICLE 1 DEFINITIONS | |
| Section 1.1. Certain Defined Terms | 2 |
| ARTICLE 2 THE CREDIT | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| ARTICLE 3 TERM, INTEREST AND PAYMENTS | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Risk Management Protection for ICA Payment | 6 |
| Section 3.8 Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. Fees | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Line of Credit Disbursement Account | 7 |
| Section 3.14. Taxes | 8 |
| ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower JV Governing Agreement | 10 |
| Section 4.15. Securitization | 11 |
| ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS | |
| Section 5.1. Development Costs | 11 |

Revised 3/17/21

DocuSign Envelope ID: Case 1:24-cv-00055-MAD-PJE Document 1-29 Filed 01/12/24 Page 3 of 61

TABLE OF CONTENTS

| | Page |
|---|---|
| RECITALS | 1 |
| ARTICLE 1 DEFINITIONS | |
| Section 1.1. Certain Defined Terms | 2 |
| ARTICLE 2 THE CREDIT | |
| Section 2.1. Line of Credit Amount | 4 |
| Section 2.2. Line of Credit Documents | 4 |
| ARTICLE 3 TERM, INTEREST AND PAYMENTS | |
| Section 3.1. Initial Term | 5 |
| Section 3.2. Extended Term | 5 |
| Section 3.3. Applicable Interest Period | 5 |
| Section 3.4. Interest Rate Calculation | 5 |
| Section 3.5. Interest Payments | 6 |
| Section 3.6. Reserves | 6 |
| Section 3.7. Intentionally Omitted | 6 |
| Section 3.8. Prepayment | 6 |
| Section 3.9. Interest Credit Account | 6 |
| Section 3.10. LOC Fee | 7 |
| Section 3.11. Line of Credit Extension Fees | 7 |
| Section 3.12. Legal and Incidental Fees, Charges and Costs | 7 |
| Section 3.13. Taxes | 8 |
| ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT | |
| Section 4.1. Delivery of the LOC Documents | 8 |
| Section 4.2. Authority | 8 |
| Section 4.3. Liens | 9 |
| Section 4.4. Litigation | 9 |
| Section 4.5. Events of Default | 9 |
| Section 4.6. Purchase and Agreement Contracts | 9 |
| Section 4.7. Compliance with Certain Requirements | 9 |
| Section 4.8. Evidence of Insurance | 9 |
| Section 4.9. Financial Statements | 10 |
| Section 4.10. Business Pro Forma | 10 |
| Section 4.11. Management Plan | 10 |
| Section 4.12. Material Change | 10 |
| Section 4.13. Non-Subordination | 10 |
| Section 4.14. Borrower Governing Agreement(s) | 10 |
| Section 4.15. Securitization | 11 |
| ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS | |
| Section 5.1. Development Costs | 11 |

---

[20] See Capstone Diagnostics One, L.P., et al. v. Bailey LLC, et al., Case No. 2022cv366001 (GA Sup. Ct., Fulton Cty., Sept. 22, 2024).
[21] See Id., Judgment entered June 24, 2023.
[22] See Id., Verified Complaint, Exhibit E, executed June 9, 2022.
[23] See Id., compared to Exhibit 29 to the Complaint filed in Compass-Charlotte v. Prime Capital Ventures, LLC, et al., Case No. 24-cv-55 (MAD) (N.D.N.Y. Jan. 12, 2024).

46. Upon information and belief, Roglieri and Humphrey met Blackwater and ALUX in connection with trying to arrange the funding for ALUX's ICA Deposit to Blackwater through Prime Commercial. That is where they learned of the concept and decided to form Prime Capital to copy the fraudulent concept apparently devised by Blackwater.

***(iii) The Proliferation of the Fraud***

47. Roglieri and Humphrey saw "success" almost immediately with the Prime Capital fraud. ICA Deposits on loans that Prime Capital had absolutely no ability to fund started flowing in at a rapid rate.

48. Prime Capital took several steps to advertise and proliferate its fraud. Among other things, it:

a. advertised heavily on YouTube by boasting about loans that never existed including the alleged $188 million to ALUX to build "The Bailey", that it "gained prominence by committing $17 billion with a South Korean firm for projects in the United States and abroad,"[24] and that it had provided "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" "[i]n the heart of Dubai";[25]

---

[24] See Prime Commercial Lending, March 17, 2022, Albany, New York's Prime Commercial Lending Funds the First 5-Star Hotel in Atlanta, GA Through Prime's Real Estate Fund, Prime Capital Ventures, [Press release]; see also Prime Commercial Lending, Prime Commercial Lending Commits to Lending $17 Billion [Video], Jan. 21, 2022, https://www.youtube.com/watch?v=PmvtmdkBUlo (YouTube) at 0:13:




[25] Koplin, I., May 2, 2022, Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund, dealmaker-magazine.com, https://www.dealmaker-magazine.com/magazine/roglieri-unveils-prime-capital-ventures-prime-commercial-lendings-newest-fund.

b. used large law firms like Sheppard, Mullin, Richter & Hampton LLP, to represent it in its loan transactions to add legitimacy to its business model, and even featured Ned Trombly, a partner of Barclay Damon LLP, as its "Lead Counsel" on its website; and

c. in the few loans that it funded in whole or in part, it got the borrowers to participate in video advertisements designed to attract new victims to the fraud.[26]

49. Prime Capital got its first ICA Deposit for prospective borrower Indigo Pharmaceutical, LLC ("Indigo") on June 3, 2022 and July 22, 2022 in the amounts of $1 million and $2 million, respectively. From there, the ICA Deposits started to flow – (i) on July 18, 2022 Prime Capital received a $1.4 million ICA Deposit for Norwell Ventures, LLC, (ii) on September 21, 2022 and September 22, 2022 Prime Capital received a $20 million ICA Deposit for Onward Partners, LLC and (iii) on October 13, 2022, Prime Capital received a $3 million ICA Deposit for Lake's Edge Development Group, LLC.

50. In total, Prime Capital took in approximately $179 million in ICA Deposits, of which approximately $109 million were returned to borrowers or advanced under the respective line of credit agreement and approximately $70 million was consumed by Roglieri, Humphrey, and Snyder, leaving no less than 16 victims left holding the bag with claims totaling over $100 million.

***(iv) The Collapse***

51. Having no legitimate source of capital to fund loans, Prime Capital's collapse was inevitable.

---

[26] See Prime Commercial Lending, Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV [Video], April 20, 2023, https://www.youtube.com/watch?v=GvmECqnuBkY&t=326s (YouTube); and Prime Commercial Lending, Prime Capital Ventures Presents Home Rentals in Carbondale, IL [Video], March 3, 2023, https://www.youtube.com/watch?v=8D5GRnKecG0.

52. Near the beginning, Humphrey expressed some concern over the inability to fund promised loans but was quickly shut down by Roglieri. For example, in June 2022, Prime Capital accepted a $1 million ICA Deposit from Indigo even though it had no ability to fund the $20 million loan that Indigo was seeking. On July 8, 2022, Humphrey sent an email to Roglieri titled "Do not sign docs for pharmacy," in which she wrote, "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." Roglieri responded "Get yourself under control. NOW." Roglieri signed the documents and Humphrey continued to participate actively in Prime Capital's fraud from that time until its collapse.

53. Once prospective borrowers realized that they were not getting their loans funded, they began demanding the return of the ICA Deposits. However, Prime Capital had squandered tens of millions of dollars in the ICA Deposits for the benefit of Roglieri, Humphrey, and Snyder, on speculative investments, propping up Roglieri's other businesses, and to purchase million-dollar vehicles, luxury watches and jewelry, domestic and international travel by private jet, and a home in Virginia Beach for Humphrey's use. Thus, when prospective borrowers demanded the return of their ICA Deposits, Prime Capital was unable to meet the demand unless it could obtain new ICA Deposits from additional victims.

54. By the end of 2023, Prime Capital was besieged by litigation brought by its victims leading to its final collapse.[27] Text messages between Humphrey and Snyder revealed Prime

---

[27] See, e.g., Truss Financial LLC v. Prime Capital, et al., Index No. 2023/510389 (N.Y.Sup. Ct. Kings Cty. Apr. 5, 2023) (seeking and apparently obtained the return of $13.4 million); B&R Acquisition Partners v. Prime Capital (JAMS Arb., Aug. 2023) (seeking return of $4.3 million); Sturm v. Prime Capital, Case No. 23-cv-1033 (N.D.N.Y. Aug. 22, 2023) (seeking return of $2 million); Camshaft CRE 1, LLC v. Prime Capital, Case No. 2023-023173 (Fla. Circ. Ct., Miami-Dade Cty., Sept. 15, 2023) (seeking return of $12.4 million); The Lion Group DFW, LLC v. Prime Capital, Case No. 23-DCV-34617 (Tex. Dist. Ct., 146th Dist., Sept. 21, 2023) (demand unknown); Onward Partners, LLC, v. Prime Capital, et al., Case No. 23-cv-833 (D. Utah Nov. 13, 2023) (seeking return of $4 million).

Capital's desperation to keep defrauding new victims. For example, on April 9, 2023, the two had the following text exchange:

| Sender | Message |
|---|---|
| Humphrey | Fuck |
| | 350 is not coming |
| Snyder | At all?? |
| | Shit |
| | Why? |
| Humphrey | Bc [a borrower]'s investor wants to look over all docs |
| | And said it will take a couple days |
| | We need it for [a different borrower] today |

and on September 19, 2023, the two corresponded as follows:

| Sender | Message |
|---|---|
| Humphrey | If we don't get a closing in today |
| | It's over |
| | Nothing we can do anymore |
| Snyder | We gotta start selling some stuff off so we can pay our bills. I need cash. |
| | Is there any point in having the csll [call] w [a prospective borrower] today then? He won't be able to wire today |
| Humphrey | Doubtful |
| | It killed us when, no LOIs [letters of intent] or closings happened |
| | Everyone requested ICA and dds [due diligence fees] back |
| | And we can't come back from it |
| | There are [law]suits all over |
| | Kris threw in the towel |

See USA v. Humphrey, Case No. 25-cr-00238, Dkt. No. 4, ¶5(i) (N.D.N.Y. June 10, 2025).

55. Even after those damning text exchanges, Prime Capital continued to solicit, take in, and rapidly consume ICA Deposits including those from 1322 Developments, LLC, by its lender ER Tennessee, in September 2023 in the amount of $14,249,832, and 1800 Park Avenue LLC in December 2023 in the amount of $5 million.

### C. The Bankruptcy Cases and Federal Equity Receivership

56. On December 19, 2023, Compass-Charlotte 1031, LLC ("Compass-Charlotte"),

526 Murfreesboro, LLC ("526 Murfreesboro"), and Newlight Technologies, Inc. (Newlight, and together with Compass-Charlotte and 526 Murfreesboro, the "Petitioning Creditors") filed an involuntary petition against Prime Capital for relief under chapter 7 of the Bankruptcy Code commencing Case No. 23-11302 ("Case 1"). The Petitioning Creditors commenced Case 1 for the obvious purpose of ensuring that Prime Capital's fraud would stop and its assets and liabilities could be liquidated in a single, public forum, and that no single creditor could win the proverbial "race to the courthouse".

57. On December 22, 2023, upon order of the Bankruptcy Court, the United States Trustee (the "U.S. Trustee") appointed Christian H. Dribusch ("Dribusch") as the interim chapter 7 trustee of Prime Capital's estate.

58. Rather than submit to the orderly winddown or restructuring of Prime Capital's business in Case 1, Roglieri pushed Prime Capital in an entirely different direction. Roglieri caused Prime Capital to contest the involuntary petition on the basis that at least two of the Petitioning Creditors' claims were allegedly subject to a bona fide dispute because litigation concerning their claims was pending. See Debtor's Motion for Judgment Dismissing the Petition, Case 1 Docket No. 72, p.1.

59. Roglieri funded fighting Case 1 by defrauding a final victim. Beginning in or around October 2023, 1800 Park Avenue LLC ("1800 Park") was negotiating a contemplated $105 million loan from Prime Capital under Prime Capital's standard model, pursuant to which Prime Capital issued a "Terms and Contingent Letter of Intent" that was executed by 1800 Park on October 25, 2023. The term sheet contemplated an ICA Deposit of $26,277,562.

60. On December 12, 2023, Prime Capital issued a "Commitment to Fund Letter" to 1800 Park for a line of credit in the amount of $98,905,467, which was executed by both Roglieri

and Jeffrey Huston of 1800 Park.

61. On December 18, 2023, one day before the commencement of Case 1, 1800 Park received draft loan documents that for the first time included Prime Commercial as the lender instead of Prime Capital.

62. Three (3) days after the commencement of Case 1, on December 22, 2023, 1800 Park entered into a deposit agreement with Prime Commercial, pursuant to which 1800 Park agreed to make an initial ICA Deposit of $5,000,000 in connection with a contemplated loan from Prime Commercial (the "1800 Park Deposit"). Contemporaneously, 1800 Park made the 1800 Park Deposit which was received into Prime Capital's Key Bank Account No. ****2233 due to Roglieri and Humphrey's failure to change the account number from Prime Capital's to Prime Commercial's. 1800 Park was completely unaware of the commencement of Case 1 against Prime Capital.

63. Immediately upon receipt of the 1800 Park Deposit on December 22, 2023, Prime Capital transferred the 1800 Park Deposit to Prime Commercial's Key Bank Account No. ****4465.

64. Roglieri and Humphrey used the 1800 Park Deposit for, among other things, the following purposes: (i) funding a $50,000 retainer to Cullen and Dykman LLP, and a $400,000 retainer to Hogan Lovells US LLP, to fight the Petitioning Creditors in Case 1; (ii) funding a $100,000 retainer to Pashman Stein to represent Roglieri personally in his bankruptcy proceeding; (iii) funding an additional $950,000 to Caruso Home Builders under an existing loan; (iv) paying $434,429.47 to Ai Design on account of a custom car buildout for Roglieri; (v) transferring $526,000 to CCTG; (vi) paying $84,000 to Wrist Aficionado for a wristwatch for Roglieri; and (vii) transferring $2,000,000 to CPH LLC, which is believed to be an entity owned by an affiliate

of Humphrey.

65. On January 8, 2024, the Petitioning Creditors filed their own motion to dismiss Case 1 [Case 1 Docket No. 74], which motion was granted by the Court on January 9, 2024 [Case 1 Docket No. 87]. Thereafter, Dribusch was discharged from his duties as chapter 7 trustee.

66. Three days after dismissal of Case 1, on January 12, 2024, Petitioning Creditor Compass-Charlotte commenced an action in the United States District Court for the Northern District of New York (the "District Court") under Case No. 24-cv-00055 (MAD) (CFH) (N.D.N.Y. Jan. 12, 2024) (the "Receivership Case"), seeking, among other things, the appointment of a federal equity receiver to take possession and control of Prime Capital's assets and affairs. That same day, the District Court entered an order appointing Paul Levine as the temporary receiver (the "Receiver") [Receivership Case Docket No. 8].

67. Roglieri directed Prime Capital to file an emergency motion on behalf of Prime Capital to, among other things, dismiss the Receivership Case. [Id. at Docket No. 12-14]. On January 24, 2024, the District Court entered a memorandum decision and order making the Receiver's appointment permanent and defining his powers with respect to Prime Capital and its property and denying Prime Capital's motion to dismiss the case. [Id. at Docket No. 56].

68. On February 15, 2024, Roglieri filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code commencing Case No. 24-10157 (REL) (the "Roglieri Case").

69. On May 14, 2024, Prime Capital, by and through the Receiver, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court commencing Case No. 24-10531 ("Case 2").

70. On May 15, 2024, the Court entered an order converting Roglieri's case to one

under chapter 7 of the Bankruptcy Code. Roglieri Case at Docket No. 159. Thereafter, the U.S. Trustee appointed Dribusch as the interim chapter 7 trustee (the "Roglieri Trustee") [Id. at Docket No. 160].

71. On July 23, 2024, the Court entered a memorandum decision and order dismissing Case 2 finding essentially that the Receiver did not have the authority to file Case 2 on behalf of Prime Capital and that the Roglieri Trustee did not have the ability to waive the defect and ratify the filing *ex post facto* [Id. at Docket No. 85].

72. The Roglieri Trustee, who at the time was in possession and control of all membership interests of Prime Capital by and through the Roglieri bankruptcy estate, exercised the necessary powers and executed the necessary documents to assume control of Prime Capital. On September 16, 2024, the Roglieri Trustee, in his capacity as the authorized agent for Prime Capital, filed a voluntary bankruptcy petition on behalf of Prime Capital for relief under chapter 11 of the Bankruptcy Code.

73. In or around May 23, 2025, the Roglieri Trustee resigned and on May 27, 2025, Marianne T. O'Toole was appointed successor chapter 7 trustee of the Roglieri bankruptcy estate (the "Successor Roglieri Trustee"). On June 3, 2025, the Successor Roglieri Trustee filed a consent to the appointment of a chapter 11 trustee in Prime Capital's case [Docket No. 280]. On June 5, 2025, the Court entered an order directing the U.S. Trustee to appoint a chapter 11 trustee [Docket No. 282], and that same day the U.S. Trustee appointed Yann Geron as the chapter 11 trustee (the "Prime Trustee") of Prime Capital [Docket No. 285], which appointment was confirmed by order of the Court on June 10, 2025 [Docket No. 287].

74. The Prime Trustee served in that capacity until on or around February 25, 2026, when the Plan went effective and the Plan Administrator was appointed.

75. On April 22, 2026, pursuant to Section 5.1 of the Plan Administrator Agreement, Yann Geron, in his capacity as Plan Administrator, resigned.

76. On April 22, 2026, pursuant to Section 2.3 of the Plan Administrator Agreement, the Oversight Committee appointed Fred Stevens, as successor Plan Administrator, effective immediately as of April 22, 2026 and Fred Stevens agreed to serve as successor Plan Administrator.

**D. The Ponzi Finding**

77. Pursuant to the *Order Confirming the Plan*, dated February 11, 2026 [Docket No. 401], the Bankruptcy Court found for the reasons stated therein that Prime Capital "was an advance pay/Ponzi scheme since its formation". See id., at p.16. That order is now final and unappealable.

78. Under the Ponzi scheme presumption, transfers made by Prime Capital, the Ponzi scheme operator, are presumed to have been made with actual fraudulent intent. See, e.g., *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007).

**E. The Criminal Convictions of Roglieri, Humphrey, and Snyder, and Related Forfeiture**

***(i) Roglieri – Criminal and Civil Forfeiture Cases***

79. On May 28, 2024, the United States of America (the "Government") filed a sealed criminal complaint against Kris Roglieri alleging probable cause exists for charging Roglieri with wire fraud committed in violation of 18 U.S.C. § 1343, commencing the case of *United States of America v. Kris Roglieri*, Case No. 24-MJ-261 (CFH) (N.D.N.Y.) (the "USA v. Roglieri").

80. On May 31, 2024, Roglieri was arrested by the Federal Bureau of Investigation, and on June 3, 2024, the District Court ordered Roglieri's detention without bail pending trial in the case [Id. at Docket No. 11].

81. On September 19, 2024, a federal grand jury returned an indictment charging Roglieri with five counts of wire fraud in violation of 18 U.S.C. § 1343.

82. On October 22, 2024, the Government commenced a civil forfeiture case against certain property that it alleged was the proceeds of Prime Capital's principals' criminal activity under the caption *United States of America v. One 2003 Ferrari Enzo AB Version E, et al.*, Case No. 24-cv-1345 (MAD/DJS) (N.D.N.Y.) (the "Civil Forfeiture Case"). The following property was named in the Civil Forfeiture Case through the original and amended complaints much of which was included in the criminal forfeiture claims asserted by the Government in USA v. Roglieri:

a. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659;

b. One 2014 Ferrari LaFerrari, VIN #: ZFF76ZHB000203166;

c. One 2022 Mercedes Benz, VIN #: W1NYC8AJXNX445045;

d. One 1982 Mercedes Benz 500SL, VIN #: WDB10704612001675;

e. One 1989 Mercedes Benz 560 SEL, VIN #: WDB1260391A497466;

f. One 2007 Mercedes Benz SLR McLaren, VIN #: WDDAJ76F27M001391;

g. One 1987 Mercedes Benz 560, VIN #: WDB1260451A315331;

h. One 2004 Porsche Carrera, VIN #: WP0ZZZ98Z4L000069;

i. One 2022 Ferrari 812 Competizione, VIN #: ZFF03TLA5N0277054;

j. One 2020 Mercedes Benz GT63C4S, VIN #: WDD7X8KB3LA012445;

k. One 2006 Maserati MC 12 Corse, VIN #: ZAMDF44B000029626;

l. One 2023 Mercedes Benz, VIN #: W1K6X7KB5PA204980;

m. One Ferrari Engine Table;

n. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held

in the name of ABBJ, LLC;

o. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC;

p. Refund in the amount of $72,825.83 in U.S. Currency seized from Ai Design;

q. One Richard Mille RM011 Watch with serial number 2722;

r. One Richard Mille RM 65-01 Watch;

s. One Rolex Watch, Serial Number: Y74R6549;

t. One Rolex Watch, Serial Number: 7P65S042;

u. One Rolex Watch, Serial Number: 0WU66577;

v. One Rolex Watch, Serial Number: 65R11547;

w. One Rolex Watch, Serial Number: 8S927086; and

x. Real property commonly known as 600 Linkhorn Drive, Virginia Beach, VA 23451

(collectively, the "Forfeiture Property").

83. By plea agreement dated November 13, 2025, Roglieri pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and submitted to the forfeiture of all Forfeiture Property plus entry of a money judgment in favor of the Government of $55,484,674.84 (the "Roglieri Plea") [USA v. Roglieri at Docket No. 90].

84. Among other things, Roglieri admitted that Prime Capital never secured a proven, demonstrated or realized source of loan funding, and that he "and his co-conspirators used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to older borrower clients" [Id. at ¶5(g)]. Roglieri further admitted that he "also drew on ICA payments to pay his own personal debts (including money owed to the Internal Revenue Service), enrich himself, and purchase million-dollar vehicles, luxury watches and jewelry, and domestic

and international travel by private jet. . . and to pay Humphrey, Snyder, and [an unidentified] Individual-1" [Id.].

85. On April 3, 2026, Roglieri was sentenced to 97 months in federal prison and is currently serving that sentence.

***(ii) Humphrey – Criminal Case***

86. By plea agreement dated June 10, 2025, filed at or around the same time as the commencement of *United States of America v. Kimberly Humphrey a/k/a Kimberly Owen*, Case No. 25-cr-238 (MAD) (N.D.N.Y.) ("USA v. Humphrey"), Humphrey pled guilty to two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and one count of health care fraud in violation of 18 U.S.C. § 1347, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Humphrey Plea") [Id. at Docket No. 4].

87. Humphrey is currently awaiting sentencing with a sentencing hearing currently scheduled for October 28, 2026.

***(iii) Snyder – Criminal Case***

88. By plea agreement dated May 16, 2025, filed at or around the same time as the commencement of *United States of America v. Christopher Snyder*, Case No. 25-cr-195 (MAD) (N.D.N.Y.) ("USA v. Snyder"), Snyder pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and consented to entry of a judgment directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of Prime Capital under 18 U.S.C. § 3663 or § 3663A (the "Snyder Plea") [Id. at Docket No. 4].

89. On April 16, 2026, Snyder was sentenced to 15 months in federal prison and is currently serving that sentence.

### F. The Berone/Reign Fraud

#### *(i) Hooking Roglieri – The Enterprise Defendants Got Prime Capital's $20 Million*

90. Mills is or was the COO of Reign. Mills was at one point a licensed attorney in the State of Florida. In 2008, Mills was disbarred following a felony conviction for one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 in the matter of *United States of America v. Gary Mark Mills*, Case No. 07-cr-20773 (S.D.F.L. Jan. 24, 2008).

91. According to Roglieri, Mills had previously enrolled in Roglieri's training course and was "promoting private placement investment opportunities on LinkedIn." Roglieri claims that he contacted Mills for the purpose of obtaining access to capital in order to fund the loans being promised to clients by Prime Capital, and that Mills represented that he could help Prime Capital access funds but would require $20 million in deposits by Prime Capital as a minimum threshold to access Reign's "trading platform".

92. Prime Capital and Reign entered into a "Joint Venture Agreement", dated as of September 28, 2022 (but purportedly signed on September 20, 2022) (the "Reign Joint Venture"), pursuant to which Prime Capital would commit $20 million to an account with a hedge fund and the parties would create a joint venture and that Reign would be "authorized to enter into Private Placement contracts, . . . , under [Reign's] name to facilitate and assist in the process of entering into an investment structure or facilitate a private placement investment opportunity".

93. At the same time as entry into the Reign Joint Venture, Prime Capital, Reign, and Aaron Etra ("Etra") entered into an escrow agreement dated September 28, 2022 (the "Etra Escrow Agreement"), pursuant to which, Etra would serve as an escrow agent with respect to the joint venture.

94. Prime Capital and Reign then entered into a "Trade Agreement for Prime Capital Ventures, LLC No. PCV-RFI-20M-092022", dated October 2, 2022 (the "Reign Trade

Agreement"). The Reign Trade Agreement was executed by Roglieri as CEO of Prime Capital and Johnson as CEO of Reign. Pursuant to the Reign Trade Agreement, Prime Capital was required to transfer $20 million to "the hedge fund, [Berone]. . , so that the hedge fund can provide [Reign] the ability to create an account at BNP Paribas and take said account into the Program [defined previously as 'a financial private commercial transaction']".

95. On October 4, 2022, Johnson introduced Roglieri to a Frank Fosco for the purported purpose of obtaining lending capital for Prime Capital. In connection therewith, Fosco sent a sample agreement, dated the prior day on October 3, 2022 (the "World Film Agreement"), pursuant to which lender Quattro Capital LLC or Quattro Canti LLC (different names appear in the document), was lending $203,100,000 to a "World Film Group, LLC" and Karo was serving as the escrow agent.

96. The World Film Agreement was purportedly signed by Quattro Capital LLC by Nick Del Franco, as Chief Executive Officer. Unbeknownst to Roglieri, Karo was a co-debtor with Nick Del Frano among others on an amended judgment, dated December 8, 2021, in the amount of $3,001,250 entered by the Oregon Supreme Court in the matter of *Twenty Second Street LLC vs. Big Boots LLC, et al.*, Case No. 19-cv-44997 (Circuit Court of Jackson County, Oregon, Dec. 8, 2021) wherein the Court found as follows:

> The Court also specifically found that defendant **Martin Karo released funds from his law practice's IOLTA trust account on February 27, 2019 while acting as a claimed "neutral escrow" without appropriate authorization and contrary to the explicit directions of plaintiff and thereafter falsely advised Plaintiff that the funds were still in trust** and would not be released even though he had disbursed such funds to undetermined recipients. **The court described such conduct of Martin Karo as nothing less than appalling**.

Judgment, p.2 (emphasis added).

97. On October 6, 2022, Roglieri replied to Frank Fosco with a copy to Johnson, Mills,

and Karo, declining to enter into any transaction and citing as reasons numerous misspellings and grammatical errors in the purported World Film Group agreement. Roglieri specifically objected to Karo's service as an escrow agent in the agreement.

98. On October 9, 2022, Stone sent an email on behalf of Berone representing that if the transaction fails, Berone will return the full $20 million to Prime Capital. On October 10, 2022, Roglieri sent an email to Stone with copy to Mills and Beguesse, requesting confirmation that if the transaction fails that the $20 million deposited will be returned within two weeks. Mills responded and confirmed that "it would be the whole $20,000,000 that is returned" and that the "timeframe of two weeks is reasonable and should be able to be accomplished."

99. On October 24, 2022, Prime Capital transferred $20 million from its Citibank Account No. **6945 to Berone at its RBC Capital Markets, LLC ("RBC Capital") Account No. ***0011 (the "Berone RBC Account").

***(ii) Unbeknownst to Roglieri, the Enterprise Defendants Took Prime Capital's Money***

100. Berone is "a registered investment advisor" and "owes a fiduciary duty to its clients". According to Beguesse, Prime Capital was one of Berone's clients.[28]

101. Pursuant to the Reign Trade Agreement, Berone was not allowed to withdraw Prime Capital's principal or use it for any transaction outside of Berone. Reign Trade Agreement, § 2.1.7. Berone completely ignored that prohibition almost immediately.

102. On or around October 26, 2022, two days after receiving Prime Capital's funds that were to remain in the Berone RBC Account, Berone transferred $3.4 million to its own Signature Bank Account no. ***3727 ("Berone Signature Account"), and $6 million to Karo's IOLTA

---

[28] See Receivership Action, Beguesse Declaration, Dkt. No. 148-1, para. 21.

account at Well Fargo Account No. ***0248 (the "Karo WF  Escrow Account").

103. On October 26, 2022, Karo transferred the $6 million of Prime Capital's funds received from Berone in the Karo WF Escrow Account to Karo's IOLTA JP Morgan Chase Bank Account No. ***9032 (the "Karo Chase Escrow Account"). The Karo Chase Escrow Account had no funds or deposits at the time of receipt of the $6 million of Prime Capital's funds from Berone following transfer from the Karo WF Escrow Account.

104. According to his LinkedIn page, Karo received his bachelor's degree from Princeton University in 1984 and his law degree from University of Michigan in 1987. According to the LinkedIn page, Karo has served as "Senior Counsel" at Global Business Resource Associates since July 2011.

105. Starting on October 28, 2022 and concluding a week later on November 4, 2022, Berone used $1,572,200.50 of Prime Capital's funds transferred to the Berone Signature Account to make several luxury purchases as follows:

| **Date** | **Transferee** | **Presumed Purpose** | **Amount** |
|---|---|---|---|
| 10/28/2022 | MaxxVin LLC | Luxury Automobiles | $283,000.00 |
| 10/28/2022 | Ferrari of Central Florida Inc. | Luxury Automobiles | $281,200.50 |
| 11/01/2022 | ATL Hawks, LLC | NBA Season Tickets | $58,000.00 |
| 11/01/2022 | Jet Linx Aviation | Private Jet Travel | $100,000.00 |
| 11/04/2022 | Phoenix American Fin. Svsc. | Private Jet Travel | $850,000.00 |

106. Those transfers made by Berone for luxury purchases were not discovered until later in or around February 2024 when Compass-Charlotte and the Receiver obtained the relevant bank statements. Beguesse later explained in testimony in the Receivership Case that the "[luxury] vehicles are not utilized for personal use" and that "[t]hey were purchased as part of [Berone's] marketing efforts, as Berone markets its services to celebrity entertainers and athletes, which come

with certain expectations of wealthy clients that their investment advisors are also successful."[29] Beguesse further testified that he had never flown in a private jet but that "Berone did fly a prospect on a private jet to an athletic event" because the "prospect was a first round NBA draftee who was interested in placing $7 million in investments with Berone."[30]

107. On November 8, 2022, Berone transferred another $5.9 million from the Berone RBC Account to the Berone Signature Account. Berone included the following handwritten note on the transfer request form submitted to RBC Capital: "Bridge loan opportunity w/ Quattro Capital". Berone then immediately transferred the $5.9 million from the Berone Signature Account to the Karo Chase Escrow Account, for a total of $11.9 million transferred to Karo escrow accounts.

108. In one of the very few online appearances, on November 9, 2022, just two weeks after Prime Capital sent the $20 million to Berone, OCC Lawyers, a law firm in the Dominican Republic, posted a video featuring Beguesse and Stone eating a lavish dinner and celebrating a closing at the seaside Jellyfish Restaurant in Punta Cana with the caption "[t]hrough this video, you will learn about the closing experience lived by Mr. Jeremiah Beguesse and Mr. Fabian Stone"[31]:

---

[29] See Receivership Action, Beguesse Declaration, Dkt. No. 157, para. 14.

[30] See Id. at para. 15.

[31] See Punta Cana Lawyers, Royal closing Jellyfish [video], Nov. 9, 2022, https://www.youtube.com/watch?v=slkt1Y2IkyY (YouTube) at 1:07. The Berone Defendants have almost no online presence. In one of the only other examples, Beguesse and possibly Stone are featured in another OCC Lawyers video published on Dec. 31, 2024 at a "white party". See Punta Cana Lawyers, OCC Lawyers 2024 White Party: Celebrating Success & Connections [video], Dec. 31, 2024 (YouTube) at 0:29:



109. By December 16, 2022, Karo distributed almost all of the $11.9 million of Prime Capital's funds received from Berone from the Karo Chase Escrow Account in the following transfers:

| Date of Transfer | Transferor/Transferee | Amount | Karo Chase Escrow Balance |
|---|---|---|---|
| 10/27/2022 | [redacted] | | $0.00 |
| 10/28/2022 | Prime Capital/Berone | $6,000,000.00 | $6,000,000.00 |
| 10/31/2022 | Shaw Concepts LLC for "Return of Escrow For Blue Ocean" | ($300,000.00) | $5,700,000.00 |
| 10/31/2022 | Fran Karo for "Repayment of Loan" | ($140,000.00) | $5,560,000.00 |
| 10/31/2022 | Quattro Capital LLC for "My lb Brick Loan Tm" | ($5,100,000.00) | $460,000.00 |
| 11/09/2022 | Prime Capital/Berone | $5,900,000.00 | $6,360,000.00 |
| 11/10/2022 | Martin Karo – Withdrawal to checking account or cashier's check to Martin Karo | ($208,000.00) | $6,152,000.00 |
| 11/10/2022 | Martin Karo – Withdrawal to checking account | ($5,000,000.00) | $1,152,000.00 |
| 11/10/2022 | Martin Karo – Withdrawal to checking account | ($692,000.00) | $460,000.00 |

---



| Date of Transfer | Transferor/Transferee | Amount | Karo Chase Escrow Balance |
|---|---|---|---|
| 11/29/2022 | Poppa Gs Quality Meats for "Yumipaws Inc./Nick Del Franco OR Ron Barzila" | ($2,264.80) | $457,735.20 |
| 12/16/2022 | Martin Karo – Withdrawal to checking account or cashier's check to Martin Karo | ($455,388.22) | $2,346.98 |

110. According to testimony of Beguesse given in March 2024, the transfers by Berone to the Karo WF Escrow Account and Karo Chase Escrow Account were verbally authorized by Roglieri.[32] Roglieri vehemently denies giving such authorization.

111. From October to December 2022, Roglieri, Stone, Mills, Beguesse, and Johnson had significant correspondence over Roglieri's failed attempts to get online access to the account where the Berone Parties and Reign Parties claimed that Prime Capital's funds were held. Stone, Mills, Beguesse, and Johnson provided myriad excuses for the inability to provide Roglieri with the access.

***(iii) Prime Capital Realized Something was Wrong and Demanded its Money Back***

112. During January 2023, Roglieri made repeated demands to Reign and Berone to terminate the transaction and return the $20 million. On January 25, 2023, Mills assured Roglieri by email that "[w]e will begin the process of unwinding everything and as soon as we are finished and Berone can return the capital, they will."

113. Beguesse and Stone made repeated misrepresentations to Roglieri regarding Prime Capital's $20 million. In sum, Beguesse and Stone represented that Berone had in fact sent the funds to the Karo WF Escrow Account but that the transfer was actually on account of funds borrowed by Reign and collateralized with Prime Capital's deposits in the Berone RBC Account or a Prime Capital subaccount thereof. In this way, Berone could fraudulently represent that Prime

---

[32] See Receivership Action, Beguesse Declaration, Dkt. No. 157, para. 12.

Capital's $20 million was still on deposit in the Berone RBC Account but provide an excuse for why Berone could not access and return the funds to Prime Capital.

114. To support its false claim, Berone, by and through Beguesse and Stone, doctored bank statements for the Berone RBC Account to show that Prime Capital's funds were still largely intact when in fact, the funds had been transferred. Beguesse and Stone then transmitted those falsified statements for all periods from November 1, 2022, to September 30, 2023, to Roglieri and Prime Capital via email.

***(iv) Prime Capital Sued the Reign Parties (but not the Berone Parties)***

115. Relying on the falsified bank statements and misrepresentations made by Beguesse and Stone, Roglieri appears to have believed the false claims and concluded that only Reign, Reign's principals, and Karo were at fault for Prime Capital being unable to access its funds.

116. On or around February 10, 2023, Prime Capital retained the law firm of Girvin Ferlazzo, PC to assist in getting its funds back. On or around February 12 or 13, 2023, Prime Capital's attorney, Daniel Rubin of Girvin Ferlazzo, PC, had a conversation regarding Prime Capital's claims against Reign with Juan Carlos A. Marquez ("Marquez"), an attorney purporting to be "General Counsel" to Reign according to his email signature block from his juancarlosmarquez-gc@reignfi.com email address.

117. On February 13, 2023, Marquez sent an email to Daniel Rubin and represented that "Reign had taken a margin on its account, and circumstances beyond Reign's control and knowledge resulted in the blockage [that has prevented Reign from releasing the purported lien on Prime Capital's funds]". Marquez represented that "[t]he release of the capital on Tuesday should allow Berone Capital to arrange for the return of Prime Capital's funds." Marquez did not disclose that Prime Capital's funds had actually been transferred out of the Berone RBC Account, that Karo had already disbursed the $11.9 million that he had received from the Karo WF Escrow Account

and Karo Chase Escrow Account, or any other relevant information.

118. According to his LinkedIn page, Marquez received his JD from Georgetown University in 1991 and that he has been the "Interim Chairman" or Reign Global Holdings, B.V. since September 2023. In addition, Marquez maintains an office for the practice of law at the Marquez Intellectual Property Law Office with offices at 1629 K Street, NW Ste 300, Washington, DC 20006.

119. On February 15, 2023, Prime Capital commenced an action captioned *Prime Capital Ventures, LLC v. Reign Financial International, Inc., Giorgio Johnson, Gary Mills and Martin Karo*, in the United States District Court for the Northern District of New York under Civil Case no. 23-cv-00207 (FJS/DJS) ("Prime v. Reign").

120. On or around June 12, 2023, the defendants in Prime v. Reign filed a motion to dismiss the complaint or to compel arbitration pursuant to the terms of the Reign Joint Venture and/or the Reign Trade Agreement. That motion has been fully submitted and the Prime v. Reign case has been stagnate without progress or discovery since that time.

***(v) Berone Got Prime Capital to Commit to Open an Account at RBC Capital Which Prime Capital Used in its own Fraud***

121. The allegations made by Prime Capital in its pleadings filed in the Prime v. Reign case repeat the misrepresentations made by Berone to Prime Capital. It appears that Prime Capital believed Berone's lies and falsified bank statements showing that Prime Capital's funds were still intact in the Berone RBC Account. Accordingly, Roglieri continued to correspond and try to do business with the Berone Defendants after the commencement of Prime v. Reign.

122. Text conversations between Roglieri, Humphrey, Gregory Caito, an internal attorney purporting to represent Prime Capital ("Caito"), Beguesse and Stone, over the course of March to September, 2023, consistently demonstrate that Beguesse and Stone made repeated false

claims about Prime Capital's funds, access to capital, access to a Bloomberg terminal, and other things, in order to obfuscate the fraud and buy time.

123. Starting in June 2023, Berone worked with Prime Capital to establish an investment advisor account for Prime Capital at RBC Capital under the Reign RBC Account under account no. 9G6-00017 (the "Prime Capital RBC Account"). The application for the account was signed by Roglieri on behalf of Prime Capital and Beguesse as Prime Capital's Financial Advisor. That account was ultimately used by Prime Capital to defraud two of its own victim creditors.

124. On September 21, 2023, ER Tennessee LLC ("ER Tennessee") funded an ICA Deposit for prospective borrower 1322 Developments, LLC ("1322"), by transferring $14,250,000.00 ($15 million ICA Deposit less $750,000 in agreed fees) to Prime Capital's Prime Capital RBC Account (the "ER Funds").

125. Prime Capital converted the ER Funds for its own use. On September 26, 2023, only five days after receipt of the ER Funds, Prime Capital transferred $7 million of the ER Funds to its account at Farmers State Bank and subsequently transferred those funds to third parties. On the "Request for Domestic Wired Funds", Prime Capital stated that the purpose of the transaction was "RETURN OF FUNDS", although the transfer was clearly just a transfer from one Prime Capital account to another. The request was signed by both Roglieri and Beguesse as Prime Capital's "Financial Advisor".

126. On October 3, 2023, Prime Capital applied for a $6 million line of credit with the Royal Bank of Canada ("RBC") and pledged the approximately $7.25 million in ER Funds still in the Prime Capital RBC Account. Virtually nothing was completed on the Line of Credit Application filled out and signed by Roglieri. The stated purpose of the loan according to the application was "General liquidity purposes".

127. RBC accepted the pledge and granted the line of credit no. 485037 (the "RBC LOC"). The RBC LOC agreement was signed by Roglieri on behalf of Prime Capital and Brent Bizyak, WM Head of Credit, North America, on behalf of RBC, and Joseph Luino, Head of Lending Services, on behalf of RBC Capital. The RBC LOC was collateralized by the "securities, commodities, and other property now or hereafter held, carried, or maintained in the securities accounts" including the Prime Capital RBC Account.

128. Although the RBC LOC application was dated October 3, 2023, an internal document produced by RBC titled "ETR – BASIC REPORT" was stamped submitted on September 27, 2023 with respect to the RBC LOC. In that document, RBC indicated that KYC [Know Your Customer] analysis was "Current & Complete" for Prime Capital. In fact, there was no indication that RBC had conducted any meaningful KYC analysis or made any of the following important inquiries: (i) what Prime Capital's business was; (ii) why Prime Capital would open an account under the Berone umbrella; (iii) why Prime Capital would take the RBC LOC for "liquidity purposes" and simply borrow against its own account; or (iv) why the Albany-based Prime Capital was opening an account at a bank based in Minneapolis.

129. According to the "Statement of Purpose for an Extension of Credit Secured by Margin Stock—FR U-1" completed by Prime Capital and executed by Roglieri and Ashley Johnson on behalf of RBC, the collateral for the RBC LOC was "at least in part, . . . the value of securities pledged as collateral for the Line of Credit thereunder." In fact, Prime Capital never purchased, sold, or traded any securities at all through the Prime Capital RBC Account. Indeed, the only contents of the Prime Capital RBC Account was the single cash deposit of the ER Funds.

130. On October 11, 2023, Prime Capital drew $5 million on the RBC LOC and on October 16, 2023, it drew the remaining $1 million. Thus, although the stated purpose of the loan

was for “General liquidity purposes”, Prime Capital drew the entire $6 million in credit availability in just two draws within five (5) days of each other and secured the loan with cash in the Prime Capital RBC Account which is definitionally liquid. Still, RBC Capital and RBC apparently did not conduct any internal investigation regarding Prime Capital’s conduct or use of the Prime Capital RBC Account. Nor did RBC inquire as to why Prime Capital would want or need to borrow against its own cash at an interest rate nearing 7%.

131. Prime Capital used the Prime Capital RBC Account and RBC LOC to do to 1322 and ER Tennessee precisely what Berone had falsely claimed that Reign had done to Prime Capital.

132. In connection with the creation of the Prime Capital RBC Account and the RBC LOC, on October 16, 2023, Berone returned $1,865,000.00 of the $20,000,000.00 to Prime Capital with a disclosed purpose of the transaction as a “Capital Distribution” according to the transfer request form signed by Beguesse.

***(vi) Prime Capital Finally Figured Out That the Berone Defendants Were in on it***

133. As Prime Capital started to succumb to litigation against it in late-2023, Roglieri appeared to still believe that only the Reign Defendants, and not Berone and its principals, were the wrongdoers. Following the commencement of Case 1, from December 29, 2023, to January 2, 2024, Roglieri and Beguesse exchanged the following text messages where Roglieri instructs Beguesse not to respond to trustee Dribusch, a request that Beguesse obliges, and Roglieri informs Beguesse that “Rein [*sic*] is going to be indicted by fbi” and that he “had a meeting with them” and “[s]aid nothing but good things about [Berone]”:




134. On or around January 21, 2024, Roglieri and Prime Capital appear to have finally determined that Berone and its principals defrauded Prime Capital along with Reign and its principals. In text communications that day to Prime Capital's counsel, Daniel Rubin, Roglieri informed him that "[w]e got huge developments in our case that was just found out on berrone, karo, and reign", that "[s]imply put it's fuckijg cracy", that "you [Rubin] were right" "[t]he whole time", "[b]ut its worse then we thought", "[l]ike they were all in on it" "[a]ll of them".

135. On January 24, 2024, RBC demanded repayment of the outstanding RBC LOC from Prime Capital in the amount of $6,094,700.18. On January 31, 2024, RBC deducted $6,094,700.18 from the ER Funds in repayment of the RBC LOC. On February 6, 2024, RBC remitted the balance of the ER Funds in the amount of $1,248,369.84 to the Receiver.

***(vii) Berone Named as Defendants in the Receivership Action***

136. During Case 1, counsel for Prime Capital provided to Compass-Charlotte a purported statement for the Prime Capital RBC Account for December 2023 showing an ending

account value of $52,364,000 in the account.

137. Upon dismissal of the Case 1, Compass-Charlotte commenced the Receivership Action against Prime Capital named four Berone related entities as defendants in the Receivership Action, including Berone Capital and the Berone Fund named as Defendants here, in order to give the Receiver powers and control over the purported funds at RBC Capital in the Prime Capital RBC Account so that they could be protected and preserved for the benefit of Prime Capital's creditors and victims. Berone failed to appear or respond to Compass-Charlotte's emergency motion for the appointment of a receiver.

138. By decision and order dated January 24, 2024, the District Court appointed the Receiver and granted him ordinary powers over Prime Capital and the named Berone defendants.

139. Compass-Charlotte and the Receiver learned through discovery that the Prime Capital RBC Account statement was forged and that the account did not have anything close to the $52,364,000 in it.

140. On or around March 8, 2024, the Berone defendants filed a motion seeking relief from the Receivership. Receivership Action, Dkt. No. 148. On March 19, 2024, the District Court entered an order declining to relieve the Berone defendants from the receivership stating, among other things, that "[t]here is evidence that the Berone Defendants have spent Prime Capital's money on luxury expenses and sent millions of dollars to an attorney" and taking note that "[p]erhaps most alarming to the Court was the Berone Defendants' representation that Prime Capital provided verbal authorization, over the telephone, to Berone, to wire $11.9 million to Mr. Karo." Receivership Action, Decision, Dkt. No. 160, pp. 39-40.

141. By decision dated June 24, 2024, the District Court relieved the Berone defendants from the receivership for the sole reason that "there is no evidence that [Compass-Charlotte's]

money was ever held by the Berone Defendants". Receivership Action, Decision, Dkt. No. 184, p. 15. However, the District Court stated "there are several facts that appear problematic to the Court when considering whether the Berone Defendants engaged in fraudulent conduct." Id. at p. 6. Among other things, the District Court noted with respect to Beguesse's claim that he was verbally authorized by Roglieri to make the transfers to Karo that "[it] also strains credulity that a reputable business would send millions of dollars via wire transfer according to only a verbal authorization." Id. at p. 7. The District Court further noted that "[t]he 'records' submitted by the Berone Defendants to the Receiver have been scarce and questionable", that the records provided by Berone do "not, in any way, substantiate the legitimacy of the Berone Defendants' business", and that "despite being able to buy expensive luxury vehicles for their business, [the Berone Defendants] work out of the basement of one of the principal's parents' homes". Id. at p. 7. The District Court agreed "with [Compass-Charlotte] and the Receiver that the Berone Defendants' business practices, particularly those connected to Prime Capital and Kris Roglieri, are surrounded by questions of legitimacy and legality." Id.

142. On December 16, 2024, each of Berone Capital, LLC, Berone Capital Partners LLC, and Berone Capital Fund, LP, filed Proofs of Claim 25 to 27, respectively (collectively, the "Berone Claims"), against Prime Capital's bankruptcy estate asserting in sum that their inclusion in the Receivership Action was a result of "the Debtor's improper, willful and malicious acts and wholly false allegations" when there was "not one shred of evidence that damages were incurred by the Debtor. . . from the actions of any Berone entities." Berone claims they were not able "to pursue opportunities coming into 2024 [Berone had] been working on for the last two years" causing total damages to Berone in "An Amount in Excess of $30,000,000.00" (emphasis in original addendum).

***(viii) The Enterprise Defendants Actively Frustrated the Bankruptcy Estate's Efforts to Figure out Where the Money Went***

143. The Enterprise Defendants have actively frustrated the bankruptcy estate's efforts to discover where Prime Capital's funds have gone. The defendants successfully objected to the estate's application to conduct discovery under Fed. R. Bankr. P. 2004. The only way the Plan Administrator knew where Prime Capital's funds went after they reached the Karo WF Escrow Account and Karo Chase Escrow Account was because the government obtained the statements for the Karo Chase Escrow Account in connection with the criminal proceeding against Roglieri and Roglieri then annexed them to his sentencing memorandum. Accordingly, it is highly likely that the Plan Administrator will not know the ultimate destination of all of Prime Capital's funds until discovery in this proceeding.

144. The Berone Defendants were repeatedly asked through counsel to provide communications with Prime Capital and the Reign Defendants and they repeatedly failed to do so.

***(ix) The SEC Sued Berone, Reign, and Their Respective Principals***

145. On May 7, 2026, the Securities and Exchange Commission ("SEC") commenced an action in the United States District Court for the Southern District of Florida by filing a complaint (the "SEC Reign/Berone Complaint") against Reign, Johnson, Mills, Berone, Beguesse, and Stone, among others in an action captioned *SEC v. Reign, et al.*, Case No. 26-cv-23237 (S.D.F.L. May 7, 2026) (the "SEC v. Reign/Berone").

146. The allegations in the SEC Reign/Berone Complaint describe several fraudulent schemes engaged in by Reign and its principals and include significant historical facts demonstrating the origin of the fraud perpetrated against Prime Capital, which was dubbed "Investor C" by the SEC. The SEC alleged that "the Reign Defendants knowingly or with severe recklessness offered and sold a $20 million investment despite having no reasonable basis to

believe that it could deliver the results or maintain the security of the funds as promised." SEC Reign/Berone Complaint, ¶ 101. If true, the SEC's allegations in the SEC Reign/Berone Complaint demonstrate that Prime Capital was defrauded by the Defendants as set forth in this Complaint.

147. According to the SEC, "[Berone, Beguesse, and Stone] knowingly or with severe recklessness misappropriated assets from the [Berone RBC Account] in violation of their fiduciary duties, the terms of the Berone Fund documents, and their representations to [Prime Capital]." *Id.* at ¶ 123. The SEC repeated many of the allegations set forth by the Plan Administrator above, but further alleged that "[t]he Berone Defendants' misappropriation of Investor C's funds for their own use and personal benefit breached the Berone Fund's governing documents, Berone's fiduciary duties, the agreement with [Prime Capital] to return all his money, and any reasonable investment purpose." *Id.* at ¶ 137.

---

**<u>FIRST CAUSE OF ACTION</u>**

| | |
|---|---|
| **Cause of Action:** | **Avoidance of Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. §§ 544(a) and 548(a); NY DCL § 273(a)(1) (NY UVTA)** |
| **Affected Defendants:** | **All Enterprise Defendants** |

---

148. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 of this Complaint as if fully set forth at length herein.

149. The Transfer constituted a transfer of money, property, and value of Prime Capital in the original amount of $20 million.

150. The Transfer was made by Prime Capital from funds that it had obtained from one or more of its victims by fraud. Thus, at the time the Transfer was made, Prime Capital had incurred or was about to incur liabilities which remain unpaid to this day.

151. The Transfer was made intentionally by Prime Capital and its principals in furtherance of Prime Capital's Ponzi and advance pay lending fraudulent scheme.

152. Each of the Enterprise Defendants created and conducted an enterprise to defraud Prime Capital out of not less than the $20 million Transfer (the "Fraudulent Enterprise").

153. The Berone Defendants created the Berone RBC Account for the purpose of receiving and transferring Prime Capital's funds under the fraudulent pretense that Berone was acting as a third-party hedge fund for the purpose of facilitating certain purported investment transactions between Reign and Prime Capital pursuant to the Reign Trade Agreement and Reign Joint Venture.

154. The Berone Defendants routinely communicated with Prime Capital and Roglieri by electronic mail, text message, and other electronic means, to facilitate the Fraudulent Enterprise. Among other things, the Berone Defendants: (i) forged bank statements for the Berone RBC Account to falsely indicate that Prime Capital's $20 million was still housed in the Berone RBC Account when in fact, it had been used to transfer funds to Karo via the Karo WF Escrow Account, to invest in unauthorized private equity investments, and to purchase luxury automobiles, NBA tickets, and private jet travel; (ii) misrepresented the nature of the transaction and falsely claimed that Prime Capital's funds were intact in the Berone RBC Account but encumbered by a loan taken by Reign; (iii) routinely misrepresented that Prime Capital's funds were able to be returned and in the process of being returned; and (iv) routinely misrepresented that the Berone Defendants and Reign Defendants were not acting in concert when they were actually all parties to the Fraudulent Enterprise designed to defraud Prime Capital out of not less than $20 million.

155. In fact, the Berone Defendants' fraudulent representations were relied upon by Prime Capital and Roglieri in making the $20 million Transfer to Berone and in commencing

litigation against the Reign Defendants rather than all Enterprise Defendants.

156. The Reign Defendants perpetrated a fraud to induce Prime Capital to make the $20 million Transfer to Berone to facilitate certain purported investment transactions with Reign pursuant to the Reign Trade Agreement and Reign Joint Venture. The Reign Defendants routinely communicated with Prime Capital and Roglieri to facilitate the Fraudulent Enterprise. Among other things, the Reign Defendants: (i) misrepresented via the nature of the transaction and falsely claimed that Prime Capital's funds were intact in the Berone RBC Account; (ii) routinely misrepresented that Prime Capital's funds were able to be returned and in the process of being returned; (iii) never created nor intended to create an account at BNP Paribas as required by and represented in the Reign Trade Agreement and Reign Joint Venture; (iv) acquired $11.9 million of Prime Capital's funds by transfer from the Berone RBC Account to the Karo WF Escrow Account and routinely misrepresented to Prime Capital that the money was available and able to be returned; and (v) used Prime Capital's funds for purposes wholly inconsistent with the Reign Trade Agreement, the Reign Joint Venture, and representations made to Prime Capital, and concealed such use from Prime Capital.

157. Karo took possession of Prime Capital's funds transferred from the Berone RBC Account without having any escrow agreement, attorney-client relationship, or other valid, permissible use of his attorney escrow account.

158. Marquez as general counsel to Reign made intentional misrepresentations via email to Prime Capital's attorneys in furtherance of the Fraudulent Enterprise stating that "Reign had taken a margin on its account, and circumstances beyond Reign's control and knowledge resulted in the blockage [that has prevented Reign from releasing the purported lien on Prime Capital's funds]". Marquez further represented that "[t]he release of the capital on Tuesday should allow

Berone Capital to arrange for the return of Prime Capital's funds." Marquez's representations were completely untrue. Reign had not taken any "margin on its account" and there was no "blockage" on Prime Capital's funds. In fact, Prime Capital's funds had long been misappropriated and used when Marquez made those representations, facts to which Marquez was entirely aware.

159. Each Enterprise Defendant was an initial transferee of the Transfer or an individual or entity for whose benefit the Transfer was made.

160. Prime Capital was a Ponzi scheme since its inception and never had any assets or funds that were not obtained by its victims under fraudulent pretenses or purchased with the proceeds of the fraud. Accordingly, Prime Capital was at all times insolvent and had no capital.

161. The Transfer was made by Prime Capital, at the direction of its principals, with actual intent to hinder, delay, and/or defraud Prime Capital's creditors and victims, and individuals and entities to which Prime Capital would become obligated.

162. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each of the Enterprise Defendants avoiding the Transfer, directing that the subject of the Transfer or its value in the amount of not less than $20,000,000 be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees thereon and making each of the Enterprise Defendants jointly and severally liable therefore.

**SECOND CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Avoidance of Constructive Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. § 544(a); NY DCL §§ 273(a)(2) and 274(a) (NY UVTA)** |
| **Affected Defendants:** | **All Enterprise Defendants** |

163. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 162 of this Complaint as if fully set forth at length herein.

164. The Transfer constituted a transfer of money, property, and value of Prime Capital.

165. The Transfer was made without reasonably equivalent value to Prime Capital.

166. At the time the Transfer was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

167. At the time that it made the Transfer, Prime Capital: (i) was insolvent or became insolvent as a result of the Transfer; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Prime Capital was an unreasonably small capital; and/or (iii) intended to incur, or believed that Prime Capital would incur debts that would be beyond Prime Capital's ability to pay as such debts matured.

168. Each Enterprise Defendant was an initial transferee of the Transfer or an individual or entity for whose benefit the Transfer was made.

169. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each of the Enterprise Defendants avoiding the Transfer, directing that the subject of the Transfer or its value in the amount of not less than $20,000,000 be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees thereon and making each of the Enterprise Defendants jointly and severally liable therefore.

---

## THIRD CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Attorneys' Fees for Avoidance of Constructive Fraudulent Transfers or Actual Fraudulent Transfers** |
| **Statute or Common Law:** | **11 U.S.C. § 544(a); NY DCL § 276-a (NY UVTA)** |
| **Affected Defendants:** | **All Enterprise Defendants** |

---

170. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 169 of this Complaint as if fully set forth at length herein.

171. The Transfer was made by Prime Capital with actual intent to hinder, delay, and defraud present and future creditors. As set forth above, each of the Enterprise Defendants knew of, participated in, and accepted the transfers with actual intent to hinder, delay, or defraud Prime Capital and its creditors.

172. The Transfer was made without reasonably equivalent value to Prime Capital.

173. At the time the Transfer was made, Prime Capital had incurred or was about to incur a liability which remains unpaid to this day.

174. At the time that it made the Transfer, Prime Capital: (i) was insolvent or became insolvent as a result of the Transfer; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Prime Capital was an unreasonably small capital; and/or (iii) intended to incur, or believed that Prime Capital would incur debts that would be beyond Prime Capital's ability to pay as such debts matured.

175. Based upon the foregoing, the Plan Administrator is entitled to recover reasonable attorney's fees pursuant to NY DCL § 276-a.

**FOURTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Recovery of Avoidable Transfers or Value Thereof From All Initial, Immediate or Mediate Transferees** |
| **Statute or Common Law:** | **11 U.S.C. § 550(a)** |
| **Affected Defendants:** | **All Defendants Plus John and Jane Does Transferees** |

176. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 175 of this Complaint as if fully set forth at length herein.

177. Upon avoidance of the Transfer, the Plan Administrator is entitled to recover for the benefit of the estate the property transferred, or the value thereof, from the initial transferee, the individual or entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee.

178. Each Enterprise Defendant was an initial transferee of the Transfer or an individual or entity for whose benefit the Transfer was made.

179. Among other John and Jane Does, Enterprise Defendant Karo made the following two transfers of Prime Capital's funds from his Karo Chase Escrow Account: (i) $140,000 on October 31, 2022 to Fran Karo, Karo's spouse or partner; and (ii) $5,100,000 on October 31, 2022 to Quattro Capital.

180. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against: (i) each of the Enterprise Defendants avoiding the Transfer, directing that the subject of the Transfer or its value in the amount of not less than $20,000,000 be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees thereon and making each of the Enterprise Defendants jointly and severally liable therefore; (ii) Fran Karo avoiding the subsequent transfer of $140,000, directing that the subject of that subsequent transfer

or its value be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees; (iii) Quattro Capital avoiding the subsequent transfer of $5,100,000, directing that the subject of that subsequent transfer or its value be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees; and (iv) John and Jane Does 1 to 10 avoiding mediate and subsequent transfers of Prime Capital's funds, directing that the subject of such transfer or transfers or their value be returned to Prime Capital's bankruptcy estate for the benefit of its victims, together with interest and fees.

## FIFTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Unjust Enrichment** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **All Defendants** |

181. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 180 of this Complaint as if fully set forth at length herein.

182. The Transfer was made from funds of Prime Capital at its expense.

183. All immediate or mediate transfers of Prime Capital's funds made by the Enterprise Defendants were made at Prime Capital's expenses.

184. It would be against equity and good conscience to permit the Defendants to retain the benefits of the Transfer made by Prime Capital.

185. Only $1,865,000 of the $20,000,000 of Prime Capital's funds has been returned by any Defendants.

186. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against: (i) each of the Enterprise Defendants in the amount of not less than $18,135,000 together with interest and fees thereon and making each of the Enterprise Defendants jointly and

severally liable therefore; (ii) Fran Karo in the amount of $140,000; (iii) Quattro Capital in the amount of $5,100,000; and (iv) John and Jane Does 1 to 10 for the value of any of the Prime Capital's funds received and retained by them.

---

**SIXTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Breach of Fiduciary Duties** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **Berone Defendants** |

---

187. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 186 of this Complaint as if fully set forth at length herein.

188. Berone Fund is "a registered investment advisor" and "owes a fiduciary duty to its clients". According to Beguesse, Prime Capital was one of Berone's clients.[33] Each of the Berone Defendants is a parent, owner, principal, or agent of Berone Fund, and accordingly, each of the Berone Defendants owes the fiduciary duties of care and loyalty to Prime Capital.

189. The Berone Defendants breached their fiduciary duties of loyalty and care to Prime Capital by, among other things:

a. obtaining $20 million from Prime Capital under false pretenses;

b. failing to hold and protect Prime Capital's funds despite representations that the Berone Defendants could and would return the funds if the transaction with Reign failed;

c. allowing Prime Capital's "principal to be withdrawn or directly used for. . . transaction[s] outside of Berone" in contradiction to the Reign Trade Agreement;[34]

---

[33] See Receivership Action, Beguesse Declaration, Dkt. No. 148-1, para. 21.
[34] See Reign Trade Agreement, §2.1.7.

d. on October 26, 2022, transferring $3.4 million of Prime Capital's funds from the Berone RBC Account to the Berone Signature Account;

e. on October 26, 2022, transferring $6 million of Prime Capital's funds from the Berone RBC Account to the Karo WF Escrow Account;

f. making the following transfers of Prime Capital's funds from the Berone Signature Account:

| Date | Transferee | Presumed Purpose | Amount |
|---|---|---|---|
| 10/28/2022 | MaxxVin LLC | Luxury Automobiles | $283,000.00 |
| 10/28/2022 | Ferrari of Central Florida Inc. | Luxury Automobiles | $281,200.50 |
| 11/01/2022 | ATL Hawks, LLC | NBA Season Tickets | $58,000.00 |
| 11/01/2022 | Jet Linx Aviation | Private Jet Travel | $100,000.00 |
| 11/04/2022 | Phoenix American Fin. Svsc. | Private Jet Travel | $850,000.00 |

g. on November 8, 2022, transferring $5.9 million of Prime Capital's funds from the Berone RBC Account to the Karo WF Escrow Account;

h. repeatedly falsely representing to Prime Capital that its funds were still intact within the Berone RBC Account when they had been wrongfully transferred by Berone;

i. providing Prime Capital with falsified financial statements for the RBC Berone Account to support the misrepresentation that Prime Capital's funds were still in the account and intact;

j. failing to account for all of Prime Capital's funds;

k. investing, spending, transferring, dissipating, or otherwise using Prime Capital's funds in ways not authorized by Prime Capital;

l. falsely claiming in sworn testimony by Beguesse in the Receivership Case that the transfers of $11.9 million to Karo's escrow account were verbally authorized by Roglieri; and

m. opposing and frustrating attempted discovery by Prime Capital's bankruptcy estate

intended to determine where Prime Capital's funds had gone and whether it can be recovered.

190. The Berone Defendants' myriad breaches of the duties of care and loyalty to Prime Capital were the actual and proximate cause of the loss of $20 million by Prime Capital, plus all fees and expenses incurred in an effort to recover those funds.

191. The Berone Defendants returned only $1,865,000 of the $20,000,000 of Prime Capital's funds leaving total actual damages to Prime Capital of $18,135,000.

192. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each of the Berone Defendants in the amount of not less than $18,135,000, plus any and all expenses, costs, and other attorneys' fees incurred as a result of the Berone Defendants' breaches of fiduciary duties, together with interest and fees thereon and making each of the Berone Defendants jointly and severally liable therefore.

## SEVENTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Aiding and Abetting Breach of Fiduciary Duties** |
| **Statute or Common Law:** | **Common Law** |
| **Affected Defendants:** | **Reign Defendants** |

193. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 192 of this Complaint as if fully set forth at length herein.

194. Each of the Berone Defendants owed the fiduciary duties of care and loyalty to Prime Capital.

195. Each of the Reign Defendants had actual knowledge of the Berone Defendants' fiduciary duties to Prime Capital. In fact, the Reign Defendants designed the Fraudulent Enterprise to defraud Prime Capital out of $20 million using the Berone Defendants, a registered investment

advisor, as cover.

196. The Berone Defendants breached their fiduciary duties to Prime Capital in the following ways:

a. obtaining $20 million from Prime Capital under false pretenses;

b. failing to hold and protect Prime Capital's funds despite representations that the Berone Defendants could and would return the funds if the transaction with Reign failed;

c. allowing Prime Capital's "principal to be withdrawn or directly used for. . . transaction[s] outside of Berone" in contradiction to the Reign Trade Agreement;[35]

d. on October 26, 2022, transferring $3.4 million of Prime Capital's funds from the Berone RBC Account to the Berone Signature Account;

e. on October 26, 2022, transferring $6 million of Prime Capital's funds from the Berone RBC Account to the Karo WF Escrow Account;

f. making the following transfers of Prime Capital's funds from the Berone Signature Account:

| **Date** | **Transferee** | **Presumed Purpose** | **Amount** |
|---|---|---|---|
| 10/28/2022 | MaxxVin LLC | Luxury Automobiles | $283,000.00 |
| 10/28/2022 | Ferrari of Central Florida Inc. | Luxury Automobiles | $281,200.50 |
| 11/01/2022 | ATL Hawks, LLC | NBA Season Tickets | $58,000.00 |
| 11/01/2022 | Jet Linx Aviation | Private Jet Travel | $100,000.00 |
| 11/04/2022 | Phoenix American Fin. Svsc. | Private Jet Travel | $850,000.00 |

g. on November 8, 2022, transferring $5.9 million of Prime Capital's funds from the Berone RBC Account to the Karo WF Escrow Account;

h. repeatedly falsely representing to Prime Capital that its funds were still intact within

[35] See Reign Trade Agreement, §2.1.7.

the Berone RBC Account when they had been wrongfully transferred by Berone;

i. providing Prime Capital with falsified financial statements for the RBC Berone Account to support the misrepresentation that Prime Capital's funds were still in the account and intact;

j. failing to account for all of Prime Capital's funds;

k. investing, spending, transferring, dissipating, or otherwise using Prime Capital's funds in ways not authorized by Prime Capital;

l. falsely claiming in sworn testimony by Beguesse in the Receivership Case that the transfers of $11.9 million to Karo's escrow account were verbally authorized by Roglieri; and

m. opposing and frustrating attempted discovery by Prime Capital's bankruptcy estate intended to determine where Prime Capital's funds had gone and whether it can be recovered.

197. Each of the Reign Defendants knew of and actively participated in one or more of the foregoing breaches. In fact, the Reign Defendants designed the Fraudulent Enterprise to include Berone, a registered investment advisor, as a middleman presumably to lend credibility to the scheme.

198. The Berone Defendants' myriad breaches of the duties of care and loyalty to Prime Capital that each of the Reign Defendants knew of and participated in, were the actual and proximate cause of the loss of $20 million by Prime Capital, plus all fees and expenses incurred in an effort to recover those funds.

199. The Berone Defendants returned only $1,865,000 of the $20,000,000 of Prime Capital's funds leaving total actual damages to Prime Capital of $18,135,000.

200. Based upon the foregoing, the Plan Administrator is entitled to an order and judgment against each of the Reign Defendants in the amount of not less than $18,135,000, plus any and all expenses, costs, and other attorneys' fees incurred as a result of the Reign Defendants knowledge of and participation in the Berone Defendants' breaches of the duties of care and loyalty to Prime Capital, together with interest and fees thereon and making each of the Reign Defendants jointly and severally liable therefore.

## EIGHTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Treble Damages in Connection with Operation of Fraudulent Enterprise in Violation of RICO** |
| **Statute or Common Law:** | **18 U.S.C. § 1962(c)** |
| **Affected Defendants:** | **All Enterprise Defendants** |

201. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 200 of this Complaint as if fully set forth at length herein.

202. Each of the Enterprise Defendants created and conducted the Fraudulent Enterprise to defraud Prime Capital out of not less than $20 million.

203. Each Enterprise Defendant, while associated with and conducting the affairs of the Fraudulent Enterprise, participated in the conduct of the Fraudulent Enterprise through a pattern of racketeering activity, specifically wire fraud.

204. The Fraudulent Enterprise was constructed and carried out by the Enterprise Defendants for the purpose of obtaining funds from victims, including Prime Capital, on fraudulent pretenses.

205. The Berone Defendants created the Berone RBC Account for the purpose of receiving and transferring Prime Capital's funds under the fraudulent pretense that Berone was acting as a third-party hedge fund for the purpose of facilitating certain purported investment

transactions between Reign and Prime Capital pursuant to the Reign Trade Agreement and Reign Joint Venture.

206. The Berone Defendants routinely communicated with Prime Capital and Roglieri by electronic mail, text message, and other electronic means, to facilitate the Fraudulent Enterprise. Among other things, the Berone Defendants: (i) forged bank statements for the Berone RBC Account to falsely indicate that Prime Capital's $20 million was still housed in the Berone RBC Account when in fact, it had been used and transferred to Karo via the Karo WF Escrow Account, to invest in unauthorized private equity investments, and to purchase luxury automobiles, NBA tickets, and private jet travel; (ii) transmitted those forged bank statement to Roglieri and Prime Capital via electronic mail; (iii) misrepresented via electronic communications the nature of the transaction and falsely claimed that Prime Capital's funds were intact in the Berone RBC Account but encumbered by a loan taken by Reign; (iv) routinely misrepresented by electronic communications that Prime Capital's funds were able to be returned and in the process of being returned; and (v) routinely misrepresented by electronic communications that the Berone Defendants and Reign Defendants were not acting in concert when they were actually all parties to the Fraudulent Enterprise designed to defraud Prime Capital out of $20 million.

207. In fact, the Berone Defendants' fraudulent representations were relied upon by Prime Capital and Roglieri in transferring the $20 million to Berone and in commencing litigation against the Reign Defendants rather than all Enterprise Defendants.

208. The Reign Defendants perpetrated a fraud to induce Prime Capital to transfer $20 million to Berone to facilitate certain purported investment transactions with Reign pursuant to the Reign Trade Agreement and Reign Joint Venture.

209. The Reign Defendants routinely communicated with Prime Capital and Roglieri by

electronic mail, text message, and other electronic means, to facilitate the Fraudulent Enterprise. Among other things, the Reign Defendants: (i) misrepresented via electronic communications the nature of the transaction and falsely claimed that Prime Capital's funds were intact in the Berone RBC Account; (ii) routinely misrepresented by electronic communications that Prime Capital's funds were able to be returned and in the process of being returned; (iii) never created nor intended to create an account at BNP Paribas as required by and represented in the Reign Trade Agreement and Reign Joint Venture; (iv) acquired $11.9 million of Prime Capital's funds by transfer from the Berone RBC Account to the Karo WF Escrow and routinely misrepresented to Prime Capital that the money had not been taken; and (v) used Prime Capital's funds for purposes wholly inconsistent with the Reign Trade Agreement and Reign Joint Venture and concealed such use from Prime Capital.

210. Karo took possession of Prime Capital's funds transferred from the Berone RBC Account without having any escrow agreement, attorney-client relationship, or other valid, permissible use of his attorney escrow account.

211. Marquez as general counsel to Reign made intentional misrepresentations via email to Prime Capital's attorneys in furtherance of the Fraudulent Enterprise stating that "Reign had taken a margin on its account, and circumstances beyond Reign's control and knowledge resulted in the blockage [that has prevented Reign from releasing the purported lien on Prime Capital's funds]". Marquez further represented that "[t]he release of the capital on Tuesday should allow Berone Capital to arrange for the return of Prime Capital's funds." Marquez's representations were untrue. Reign had not taken any "margin on its account" and there was no "blockage" on Prime Capital's funds. In fact, Prime Capital's funds had long been misappropriated and used when Marquez made those representations.

212. Until further discovery is obtained, it is unclear how many other victims of the Enterprise Defendants there are. Still, there are a significant number of predicate acts by each of the Enterprise Defendants in furtherance of the Fraudulent Enterprise to defraud Prime Capital of $20 million by wire fraud. Among others, the Plan Administrator has identified the following specific predicate fraudulent acts that resulted in Prime Capital wiring $20 million to Berone:

| Date | Defendant(s) | Communication and/or Act | Description of Fraudulent Conduct |
|---|---|---|---|
| HOLD[36] 09/22 to 10/3/22 | Mills | Emails referenced in pleadings[37] | False claims that Reign could gain access to a commercial trading platform that would allow it to arbitrage international commercial placement programs. |
| Same | Mills | Same | False claims that Reign would open an account with BNP Paribas and that funds deposited by Prime Capital into Berone would enable it to enter into commercial transactions. |
| Same | Mills | Same | Transmittal of Reign Joint Venture and Reign Trade Agreement which Reign had no intention of or ability to perform under. |
| 10/4/22 | Johnson | Email | |
| 10/9/22 | Stone | Email | False claims that "If the trade fails, ReignFi will unwind the funds sent to trade and Berone Capital/ReignFi will return all remaining funds" and that "[i]f the trade is successful, the funds will be locked with Berone Capital Fund for 1 year from the trade execution date." |
| 10/10/22 | Mills | Email | False claims that Prime Capital's $20 million can and will be returned if the "trade program should fail" knowing that there was no trade program and that the $20 million could not be returned. |
| 10/10/22 | Stone | Email | Falsely confirming that $20 million will be returned within two weeks if trade program fails. |

[36] The term "HOLD" referenced in this chart is for emails or electronic transmittals referenced in pleadings or other documents filed or provided by Prime Capital, its principals, and/or certain Defendants, but for which the Plan Administrator does not possess at the time of filing of this Complaint. The Plan Administrator's and his predecessors' efforts to obtain pre-litigation discovery from the Enterprise Defendants was rebuffed. Further, the criminal prosecution of Roglieri and Humphrey delayed the Plan Administrator from obtaining access to Rogerli's and Humphrey's electronic devices that were obtained by the Government. The Plan Administrator is now in the process of searching and obtaining access to the contents of those electronic devices and anticipates amending this Complaint to complete, amend, or supplemnt portions of this chart marked "HOLD".

[37] See Prime v. Reign, Amended Complaint, ¶¶15-27

| Date | Defendant(s) | Communication and/or Act | Description of Fraudulent Conduct |
|---|---|---|---|
| 10/24/22 | Prime Capital | Wire Transfer of $20 million to Berone | Transfer obtained by fraudulent representations. |
| 10/26/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $3.4 million from Berone RBC Account to Berone's Signature account | Unauthorized wire transfer of funds that were to remain intact in the Berone RBC Account. |
| 10/26/22 | Berone<br>Beguesse<br>Stone<br>Karo | Wire Transfer of $6 million of Prime Capital's funds in the Berone RBC Account to the Karo WF Escrow Account | Unauthorized wire transfer of funds that were to remain intact in the Berone RBC Account. |
| 10/26/22 | Karo | Wire Transfer of $6 million from the Karo WF Escrow Account to the Karo Chase Escrow Account | Unauthorized wire transfer of Prime Capital's funds in a second layering transaction by Karo. |
| 10/28/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $283,000 from Berone's Signature Account to MaxxVin LLC | Unauthorized fraudulent use of Prime Capital's funds to purchase luxury automobiles for Berone, Beguesse, and Stone. |
| 10/28/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $281,200.50 from Berone's Signature Account to Ferrari of Central Florida Inc. | Unauthorized fraudulent use of Prime Capital's funds to purchase luxury automobiles for Berone, Beguesse, and Stone. |
| 10/31/22 | Karo | Wire Transfer of $300,000 from Karo Chase Escrow Account to Shaw Concepts LLC | Unauthorized fraudulent use of Prime Capital's funds for transaction that is referenced as "Return of Escrow For Blue Ocean". |
| 10/31/22 | Karo | Wire Transfer of $140,000 from Karo Chase Escrow Account to Fran Karo | Unauthorized fraudulent use of Prime Capital's funds for transaction that is referenced as "Repayment of Loan" to Fran Karo, Karo's spouse. |
| 10/31/22 | Karo | Wire Transfer of $5,100,000 from Karo Chase Escrow Account to Quattro Capital LLC | Unauthorized fraudulent use of Prime Capital's funds for transaction that is referenced as "My lb Brick Loan Tm", in spite of an email received by Karo from Roglieri on 10/6/22 wherein Roglieri expressly refused to enter into a transaction with Quattro Capital or any transaction with Karo serving as the escrow agent. |

| Date | Defendant(s) | Communication and/or Act | Description of Fraudulent Conduct |
|---|---|---|---|
| 11/1/22 | Stone | Email | Falsely claiming that "you [Roglieri] should be receiving an email with your login credentials from our Admin service (Bolder Group)" when there was no intention or ability of providing Roglieri with login credentials. |
| 11/1/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $58,000 from Berone's Signature Account to ATL Hawks, LLC | Unauthorized fraudulent use of Prime Capital's funds to purchase sports tickets for the Atlanta Hawks NBA Team for Berone, Beguesse, and Stone. |
| 11/1/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $100,000 from Berone's Signature Account to Jet Linx Aviation | Unauthorized fraudulent use of Prime Capital's funds to purchase private jet travel for Berone, Beguesse, and Stone. |
| 11/4/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $850,000 from Berone's Signature Account to Phoenix American Fin. Svsc. | Unauthorized fraudulent use of Prime Capital's funds to purchase private jet travel for Berone, Beguesse, and Stone. |
| 11/8/22 | Berone<br>Beguesse<br>Stone | Wire Transfer of $5.9 million of Prime Capital's funds in the Berone RBC Account to the Berone Signature Account | Unauthorized wire transfer of funds that were to remain intact in the Berone RBC Account. |
| 11/9/22 | Berone<br>Beguesse<br>Stone<br>Karo | Wire Transfer of $5.9 million of Prime Capital's funds in the Berone Signature Account to the Berone Signature Account | Unauthorized wire transfer of funds that were to remain intact in the Berone RBC Account in a second "layering" transaction by Berone. |
| 11/10/22 | Karo | Transfer of $208,000 from Karo Chase Escrow Account to Martin Karo | Unauthorized fraudulent use of Prime Capital's funds. |
| 11/10/22 | Karo | Transfer of $5,000,000 from Karo Chase Escrow Account to Martin Karo | Unauthorized fraudulent use of Prime Capital's funds. |
| 11/10/22 | Karo | Transfer of $692,000 from Karo Chase Escrow Account to Martin Karo | Unauthorized fraudulent use of Prime Capital's funds. |

| Date | Defendant(s) | Communication and/or Act | Description of Fraudulent Conduct |
|---|---|---|---|
| 11/18/22 | Mills | Email | Falsely claiming that Reign is in the process of negotiating the contract to set up the program contemplated by the Reign Joint Venture and Reign Trade Agreement when Reign had no ability or intention to set up the program and in fact, the funds had already left the Berone RBC Account unbeknownst to Roglieri. |
| 11/29/22 | Karo | Transfer of $2,264.80 from Karo Chase Escrow Account to Poppa Gs Quality Meats | Unauthorized fraudulent use of Prime Capital's funds for what is referenced as "Yumipaws Inc./Nick Del Franco OR Ron Barzila". |
| 12/8/22 | Stone | Email | Falsely claiming that Berone is creating a new "admin access" relationship following which Roglieri will get access to an account statements portal. |
| 12/16/22 | Karo | Transfer of $455,388.22 from Karo Chase Escrow Account to Martin Karo | Unauthorized fraudulent use of Prime Capital's funds. |
| 12/20/22 | Stone | Email | Falsely claiming that "our Fund is not without Admin services and your subscription is very secure and held at Royal Bank of Canada". |
| 1/25/23 | Mills | Email | Falsely claiming that "[w]e will begin the process of unwinding everything and as soon as we are finished and Berone can return the capital, they will" while Berone no longer held the capital and there was no intention or ability to return it. |
| 2/8/23 | Stone | Email | Purporting to make available additional line of credit to Prime Capital requiring Prime Capital to deposit more funds. There was no source of credit for Prime Capital. This email was an attempt to obtain more deposit funds from Prime Capital under fraudulent pretenses. |
| 2/13/23 | Marquez | Email | Falsely claiming that Reign took a "a margin on its accounts" and "circumstances beyond Reign's control and knowledge resulted in the blockage" that prevented Berone from releasing Prime Capital's funds, and that the "capital will be released on Tuesday, February 14, 2023." |
| 3/1/23 | Stone | Email | Falsely confirming Roglieri's inquiry that if he deposits "30 to 40 million" he can "take the 3x line" and the logistics and mechanics of doing so, when there was no line of credit available to Prime Capital. |

| Date | Defendant(s) | Communication and/or Act | Description of Fraudulent Conduct |
|---|---|---|---|
| 3/3/23 | Beguesse | Email | Responding to inquiry by Roglieri and furthering the false claim that the funds were transferred to Karo/Reign as opposed to Reign obtaining a loan collateralized by the funds in the Berone RBC Account, and falsely claiming that funds were transferred to Karo on "11/07" when the first tranche of $6 million was sent on October 26, 2022. |
| 3/21/23-3/27/23 | Stone | Text Messages | Numerous text messages regarding obtaining a source of lending capital for Prime Capital with "Interactive" that did not exist. |
| 4/26/23 | Beguesse | Email | Providing incorrect amounts for what remains in Prime Capital's account and payoffs for a loan that did not exist. |
| 4/26/23 | Stone | Email | Providing three falsified bank statements from the Berone RBC Account for January, February, and March 2023 showing Prime Capital's funds intact. |
| HOLD | HOLD | Beguesse?<br>Stone? | Emails transmitting falsified statements for the Berone RBC Account and/or Prime Capital subaccount falsely showing Prime Capital's $20 million or most of which was still intact. |
| 12/15/23 | Beguesse | Email | Attempting to "withdraw" the previously doctored statements for the Berone RBC Account as follows, "[t]he SEC lawyers expressed their belief that 21 million dollars is missing. While our lawyers are not aware whether the inaccurate client statements have been produced in Prime's litigation with Reign, I have been instructed to withdraw those monthly statements provided to you at your request." |

213. The Enterprise Defendants' offensive conduct took place over an extended period of time and involved numerous emails, text messages, wire transfers, and oral communications intended to obtain Prime Capital's initial $20 million, keep Prime Capital form learning of the actual disposition of its funds through repeated false claims, and obtain more funds from Prime Capital by promising additional purported borrowing opportunities.

214. The Enterprise Defendants knowingly agreed to participate in the Fraudulent Enterprise whose objective was to conduct the affairs of the Fraudulent Enterprise through a

pattern of racketeering activity, including wire fraud. Each Enterprise Defendant knew the essential nature of the fraudulent scheme and knowingly agreed to facilitate its accomplishment. In furtherance of that agreement, the conspirators committed the predicate acts described above.

215. The Enterprise Defendants coordinated their activities through emails, text messages, and oral communications.

216. As a direct and proximate result of the Enterprise Defendants' employment of the Fraudulent Enterprise, Prime Capital transferred $20 million to accounts controlled by the Fraudulent Enterprise, only $1.865 million of which has been returned. Accordingly, Prime Capital thereby suffered a direct economic injury of not less than $18,135,000.

217. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three times Prime Capital's actual damages, or $54,405,000, together with prejudgment interest, attorneys' fees and costs, for which each of the Enterprise Defendants is liable, jointly and severally.

## NINTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Treble Damages Participating in a Conspiracy in Violation of RICO** |
| **Statute or Common Law:** | **18 U.S.C. § 1962(d)** |
| **Affected Defendants:** | **All Enterprise Defendants** |

218. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 217 of this Complaint as if fully set forth at length herein.

219. The Enterprise Defendants had an agreement to conduct the Fraudulent Enterprise designed to deprive Prime Capital of not less than $20 million (the "Fraudulent Agreement").

220. Each of the Enterprise Defendants entered into the Fraudulent Agreement knowingly and willingly. In sum, for each group's role in the Fraudulent Enterprise, the Reign Defendants were to receive $11.9 million which was received through unauthorized transfers by

Berone to Karo's escrow account, and the Berone Defendants were to receive the remaining $8.1 million, of the $20 million fraudulently obtained from Prime Capital.

221. Each of the Enterprise Defendants took part in the conspiracy by one or more of the following: (i) conspiring with one another as to the conduct of the Fraudulent Enterprise; (ii) sending numerous emails and/or text messages containing false statements intended to defraud Prime Capital of $20 million; (iii) sending numerous emails and/or text messages designed to cover up the taking of Prime Capital's $20 million and frustrate Prime Capital's efforts to obtain its return; and (iv) actually possessing, transferring, and/or using funds obtained from Prime Capital by fraudulent means.

222. As a direct and proximate result of the Enterprise Defendants' employment of the Fraudulent Enterprise, Prime Capital transferred $20 million to accounts controlled by the Fraudulent Enterprise, only $1.865 million of which has been returned. Accordingly, Prime Capital thereby suffered a direct economic injury of not less than $18,135,000.

223. Plaintiff is entitled to recover three times Prime Capital's actual damages, or not less than $54,405,000, together with prejudgment interest, attorneys' fees and costs, for which each of the Enterprise Defendants is liable, jointly and severally.

---

## TENTH CAUSE OF ACTION

| | |
|---|---|
| **Cause of Action:** | **Pre-Judgment Interest and Attorneys' Fees** |
| **Statute or Common Law:** | **Mixed – 11 U.S.C. § 550(a); 28 U.S.C. § 1961; NY CPLR §§ 5001 and 5004** |
| **Affected Defendants:** | **All Defendants** |

---

224. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 223 of this Complaint as if fully set forth at length herein.

225. The Plan Administrator is entitled to a judgment awarding him pre-judgment

interest with respect to the claims asserted in this Complaint from the inception of the relevant cause of action to the date of judgment.

---

**ELEVENTH CAUSE OF ACTION**

| | |
|---|---|
| **Cause of Action:** | **Disallowance of All Claims** |
| **Statute or Common Law:** | **11 U.S.C. § 502(d) and (j)** |
| **Affected Defendants:** | **All Defendants** |

---

226. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 225 of this Complaint as if fully set forth at length herein.

227. Defendants are transferees of transfers avoidable under sections 544(a) and/or 548 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

228. Defendants have not paid the amount of the Avoidable Transfer(s), or turned over such property, for which Defendants are liable under section 550 of the Bankruptcy Code.

229. Pursuant to section 502(d) of the Bankruptcy Code, any and all Claims of Defendants and/or their assignee, against Prime Capital must be disallowed until such time as Defendants pay to Plaintiff an amount equal to the aggregate amount of all avoidable Transfers made to or for the benefit of such Defendant, plus interest thereon and costs.

230. Pursuant to section 502(j) of the Bankruptcy Code, any and all Claims of Defendant, and/or its assignee, against the Debtors previously allowed by the Debtors or by Plaintiff, must be reconsidered and disallowed until such time as Defendant(s) pay to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfer(s) received by such Defendant.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

A. Against All Enterprise Defendants on the First and Second Causes of Action, in the total amount of not less than $20,000,000.00, for which each of the Enterprise Defendants shall be jointly and severally liable therefore;

B. Against All Enterprise Defendants on the Fifth, Sixth and Seventh Causes of Action, in the total amount of not less than $18,135,000.00, for which each of the Enterprise Defendants shall be jointly and severally liable therefore;

C. Against All Enterprise Defendants on the Eighth and Ninth Causes of Action, in the total amount of not less than $54,405,000.00, for which each of the Enterprise Defendants shall be jointly and severally liable therefore;

D. Against Defendant Quattro Capital on the Fourth Cause of Action, presuming a judgment is entered against one or more of the Enterprise Defendants on the First and/or Second Cause of Action, in the amount of $5,100,000.00;

E. Against Defendant Quattro Capital on the Fifth Cause of Action, requiring Quattro Capital to return the unjust benefits it received in the amount of $5,100,000.00;

F. Against Defendant Fran Karo on the Fourth Cause of Action, presuming a judgment is entered against one or more of the Enterprise Defendants on the First and/or Second Cause of Action, in the amount of $140,000.00;

G. Against Defendant Fran Karo on the Fifth Cause of Action, requiring Fran Karo to return the unjust benefits she received in the amount of $140,000.00;

H. Against John and Jane Does 1 to 10 on the Fourth Cause of Action, presuming a judgment is entered against one or more of the Enterprise Defendants on the First and/or Second Cause of Action, in the amount of the value of any immediate, mediate or subsequent

transfer of Prime Capital's funds;

I. Against all Defendants on the Third and Tenth Causes of action, an amount to be determined at trial on account of all attorneys' fees, costs, and other damages of Prime Capital's bankruptcy estate, plus prejudgment interest;

J. Against all Defendants on the Eleventh Cause of Action, disallowing any claim of each Defendant against Prime Capital's bankruptcy estate; and

K. Granting the Plan Administrator such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 15, 2026

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: */s/ Fred Stevens*

Fred Stevens
Lauren C. Kiss
Kevin B. Collins
286 Madison Avenue, 11th Floor
New York, New York 10017
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: fstevens@klestadt.com
lkiss@klestadt.com
kcollins@klestadt.com

*Counsel to the Plaintiff Plan Administrator*